Theresa OWENS, Administrator of the Estate of Carmen Dicesare, Deceased,

v.

Frances MAZZEI, Lucia Squitieri and Prudential Savings Bank.

Appeal of Prudential Savings Bank, PaSA.

Appeal of Frances Mazzei and Lucia Squitieri.

Superior Court of Pennsylvania.

Argued Dec. 19, 2003.
Filed April 7, 2004.

Susan M. Verbonitz, Philadelphia, for Prudential.

Karl L. Prior, King of Prussia, for Owen.

Salvatore S. LaRussa, Philadelphia, for Mazzei and Squitieri.

Before: JOHNSON, LALLY–GREEN and POPOVICH, JJ.

OPINION BY JOHNSON, J.:

¶ 1 Frances Mazzei, Lucia Squitieri, and Prudential Savings Bank, PaSA, (collectively "Prudential") appeal the trial court's order finalizing a decree nisi that held the defendants jointly and severally liable to the Estate of Carmen DiCesare for $563,767.40, together with interest and costs. The court determined that Mazzei and Squitieri had, while acting in the course and scope of their duties as bank employees, exercised undue influence over the decedent to cause him to name them as the sole beneficiaries of a bank account that contained the bulk of his assets. Accordingly, the court imposed liability on the bank under a theory of *respondeat superior*, and found the bank liable directly for negligent supervision. Prudential asserts that the court erred as a matter of law in determining the duty of care applicable to the bank's conduct, and argues also that the evidence does not sustain the court's findings. Upon review of the court's painstaking findings and conclusions, we find Prudential's assertions meritless and affirm the court's order.

¶ 2 This matter arose out of a challenge by the decedent's estate to the transfer to Mazzei and Squitieri of the balance of an account that the decedent held at Prudential Savings Bank. The account, of a type sometimes known as a "poor man's will," provided ostensibly that the principal was held by the decedent in trust for Mazzei and Squitieri as beneficiaries. Not coincidentally, Mazzei and Squitieri were the branch manager and assistant manager, respectively, of the bank's branch at 19th and Snyder Streets in south Philadelphia where the decedent had opened the account. Both had participated in opening the account after Mazzei told the decedent, then 82 years old, that she could not process his request for direct deposit of his social security check into his passbook account because he had lost the passbook. Mazzei required accordingly that to obtain direct deposit the decedent open the new account (ITF account).

¶3 On August 8, 2000, the decedent opened the account and expressed his intent in a writing prepared by Mazzei: "I CARMEN DICESARE ON 8-8-00 OPEN NEW ACCOUNT # 01-90-31273. I WISH TO PUT THE ACCOUNT IN TRUST TO FRANCES MAZZEI AND LUCIA SQIIERI [sic]." That day, the decedent transferred into the account the balance of his other accounts at Prudential, ($247,165.34), as well as money on deposit at nearby Sharon Savings Bank (Sharon) ($311,263.24). The following day, he withdrew the remainder of his deposits from Sharon, ($122,026.05), and moved the sum to the ITF account at which point the balance reached $680,454.63. Mazzei wrote the account balance on a piece of paper in large numbers with a black marker and gave it to the decedent along with a duplicate passbook. The duplicate passbook did not contain the number of the account and could not be used to transact business at any other Prudential Branch. The original passbook, required either to make withdrawals or to change beneficiaries, remained at the branch in the possession of Squitieri and Mazzei. The account balance was supplemented thereafter with the arrival of the decedent's social security payments in the amount of $709 per month.

¶4 Following the decedent's passing on June 13, 2001, the bank transferred $698,566.72 from the ITF account to a Prudential account titled to Mazzei and Squitieri. Over the following three months, Mazzei and Squitieri moved the money to other accounts at Prudential using journal debits, and ultimately withdrew the money. Because bank policy prohibited employees from handling transactions on their own accounts, each of the women would handle the other's transfers. On September 24, 2001, two days after they learned that the decedent's estate had retained counsel, Mazzei and Squitieri made their final withdrawals, removing a remaining total of $408,000. Again, each counter-signed the other's withdrawal. Subsequently, Mazzei deposited her share of the money in her husband's account at the Police Fire Credit Union and he, in turn, wrote a series of checks to various friends and neighbors averaging $9,000 each.

¶5 By decree dated December 28, 2001, the Register of Wills appointed Theresa Owens (the Administrator) administrator of the Estate of Carmen DiCesare. On January 8, 2002, the Administrator petitioned the Orphans' Court for Citation to Show Cause Why Assets Should Not be Turned Over to the Estate. The Administrator sought the return of all sums paid to Mazzei and Squitieri from the ITF account, claiming that the two had obtained the money by exercise of undue influence. Additionally, the Administrator sought recovery from Prudential on theories of *respondeat superior* and negligent supervision, contending that Mazzei and Squitieri had acted within the course and scope of their duties with Prudential when they opened the ITF account, and that Prudential had failed, *inter alia*, to impose effective policies and procedures to prevent self-dealing by bank employees.

¶6 On April 23, 2002, following a hearing, the court ordered Mazzei and Squitieri to pay all remaining proceeds of the ITF account to Jerome R. Balka, Esquire, to be held in escrow pending final disposition of the Estate's claim. However, Mazzei and Squitieri were able to remit only $156,000. Subsequently, in November 2002, the court commenced trial on the Estate's claim for the remainder of the money. Following extensive testimony, including that of medical experts, as well as neighbors and caretakers who observed the decedent before and after the opening of the ITF account, the court concluded that the decedent suf-

fered from a weakened state of mind, that he had trusted Mazzei and Squitieri to assist him and protect his assets, and that they had exploited his trust to convert those assets to their own uses. The court concluded further that the defendants failed to rebut the resulting presumption of undue influence. Accordingly, the court held Mazzei, Squitieri, and the bank liable on the Estate's claims of undue influence.

¶ 7 Concerning the Estate's claims of negligent supervision, the court reached the conclusion that:

> Negligence and inconsistency permeate the bank's environment. . . .
>
> Throughout the trial, the Court heard evidence of the Bank's selective application of account opening policies and proced[u]res, and unwritten exceptions or modifications to nearly every Bank policy applicable to the transactions and documents at issue. Both Mazzei and Squitieri exploited this procedurally liquid environment. . . . The Bank's environment, and lack of meaningful controls proved fertile soil for the undue influence at issue.

Trial Court Opinion, 5/5/03, 34–35. Consequently, the court held the bank liable for negligent supervision. The court then entered the decree that all three defendants now appeal.

¶ 8 For purposes of appellate review, Mazzei and Squitieri have joined the brief filed by Prudential. Prudential raises the following questions for our review:

1. Did the Orphans' Court err in finding that a confidential relationship existed between Frances Mazzei ("Mazzei") and Lucia Squitieri ("Squitieri"), two employees of Prudential Savings Bank, PaSA ("Prudential"), and Carmen DiCesare (the "Decedent"), a bank customer, which enabled Mazzei and Squitieri to exercise undue influence over the Decedent?

2. Did the Orphans' Court err in failing to find that the relationship between Prudential and Decedent was one of creditor and debtor which relationship imposes no fiduciary responsibility on Prudential with regard to the decedent's account?

3. Did the Orphans' Court err in holding that Prudential is vicariously liable for the alleged wrongful acts of its employees?

4. Did the Orphans' Court err in finding that Prudential was negligent by: (a) complying with Decedent's request to open an account in his name in trust for Mazzei and Squitieri; (b) supervising its employees with respect to opening this type of accounts [sic]; and (c) permitting disbursements of funds from Decedent's account upon his death to the beneficiaries designated by Decedent?

5. Did the Orphans' Court err in awarding attorneys' fees and costs to the Decedent's estate when there is no agreement or statute which provides for such a recovery and where the assessment of any such fees, interest and costs was subsequently denied by the Orphans' Court?

Brief for Appellant at 2. Before proceeding, we observe that the argument appearing in Prudential's appellate brief does not correspond with the order of the questions set out above. No designated section appears in Prudential's argument addressing questions 2 and 5, and argument posited in support of question 1 appears to exceed the scope of the question presented. Consequently, we decline to consider questions 2 and 5, and will limit our review of Prudential's remaining contentions to the

706

extent that its brief provides both an appropriate question and corresponding analysis. *See* Pa.R.A.P. 2116, 2119(a), 2101.

▌ ¶ 9 Our standard of review of the findings of an Orphans' Court is deferential.

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of [ ] discretion.

*In re Estate of Harrison*, 745 A.2d 676, 678 (Pa.Super.2000) (internal citations omitted). If the court's findings are properly supported, we may reverse its decision only if the rules of law on which it relied are palpably wrong or clearly inapplicable. *See id.* at 678–79.

¶ 10 In support of its first claim, Prudential asserts that the Orphans' Court erred in determining that Mazzei and Squitieri had exercised undue influence over decedent Carmen DiCesare when they superintended his creation of the ITF account and his subsequent transfer of assets into it. Brief for Appellant at 2. Prudential contends specifically that the evidence fails to establish that the decedent suffered a weakened intellect and fails to establish that the decedent relied upon Mazzei and Squitieri in any manner sufficient to create a legally cognizable confidential relationship. Brief for Appellant at 13, 18. Prudential argues that its relationship with the decedent was instead contractual in nature and that it owed him no special duty to prevent the acts that the trial court found Mazzei and Squitieri had committed. Brief for Appellant at 16. We find no merit in any of Prudential's assertions.

▌ ¶ 11 "[U]ndue influence is a 'subtle,' 'intangible' and 'illusive' thing," *In re Estate of Clark*, 461 Pa. 52, 334 A.2d 628, 635 (1975), "generally accomplished by a gradual, progressive inculcation of a receptive mind," *id.* at 634. Consequently, its manifestation "may not appear until long after the weakened intellect has been played upon." *Id.* Because the occurrence of undue influence is so often obscured by both circumstance and design, our Courts have recognized that its existence is best measured by its ultimate effect. Thus, the Courts' holdings establish a presumption of undue influence when the evidence demonstrates: (1) that a person or persons in a confidential relationship with a testator or grantor has (2) received a substantial portion of the grantor's property, and (3) that the grantor suffers from a weakened intellect. *See id.* at 632; *see also In re Estate of Glover*, 447 Pa.Super. 509, 669 A.2d 1011, 1015 (1996). Once the presumption has attached, the burden of proof shifts to the defendant to disprove undue influence by clear and convincing evidence that one of the foregoing criteria is not established. *See Clark*, 334 A.2d at 632; *Glover*, 669 A.2d at 1015.

¶ 12 In this case, Prudential does not appear to contest the trial court's conclusion that Mazzei and Squitieri benefited substantially from their status as the beneficiaries of the ITF account. Indeed, the record demonstrates that they received the bulk of the decedent's property, almost $600,000 in cash. Prudential does contest, however, the trial court's companion findings that the decedent suffered from a weakened intellect and that he was engaged in a confidential relationship with Mazzei and Squitieri when he signed the account agreement that created the ITF account. Brief for Appellees at 13, 18. In

support of its claim that no confidential relationship existed, Prudential contends that the relationship of a bank to its customer is contractual and that its duty to the customer is limited to the contours of the contract. Brief for Appellees at 12–13. Thus, Prudential's argument effectively contests the sufficiency of the evidence to establish a confidential relationship. In support of its claim concerning the "weakened intellect" of the decedent, Prudential appears to argue the weight of the evidence. Brief for Appellant at 18 ("Despite the overwhelming evidence on the record that the Decedent was mentally cognizant at the time he opened the ITF Account, Judge O'Keefe nevertheless found that Mazzei and Squitieri exercised undue influence over Decedent."). Because the decedent's "weakened intellect" contributed to the trial court's finding of a confidential relationship, we will consider first the evidence pertinent to the decedent's mental state.

■■■■■■ ¶ 13 Our Supreme Court has cautioned that "weakened mentality as relevant to undue influence need not amount to testamentary incapacity." *Clark*, 334 A.2d at 634; *see also Glover*, 669 A.2d at 1015; *Burns v. Kabboul*, 407 Pa.Super. 289, 595 A.2d 1153, 1163 (1991). Consequently, the grantor's mental condition at the moment he authorized the transfer of his property is "not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. [When the challenge is based on undue influence,] more credence and weight may be given to the contestant's remote medical testimony." *See Clark*, 334 A.2d at 634. Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation. *See*

*Glover*, 669 A.2d at 1015. The Orphans' Court's mandate in assessing such evidence is relatively broad. *See Clark*, 334 A.2d at 634. If the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions. *See id.* at 635. Under no circumstance will we substitute our judgment of credibility for that of the Orphans' Court. *See id.* (explaining that standard of appellate review of trial court's finding of undue influence "is not whether the appellate court would have reached the same result").

■■■ ¶ 14 Upon review of the record and the comprehensive findings rendered by Judge O'Keefe, we find the court's conclusion supported by compelling, indeed overwhelming, evidence that the decedent was in precipitous mental decline both before and after he opened the ITF account. Multiple witnesses, including the decedent's treating physician, documented the decedent's impairment many months before he opened the ITF account. Their recollections, which Judge O'Keefe properly weighed in his role as the finder of fact, offer a disconcerting portrayal of a man in the grip of dementia whose condition was apparent not only to professional observers but to anyone who had significant contact with him. Prudential's argument to the contrary, which relies upon challenges to witness credibility, falls markedly short of demonstrating evidentiary insufficiency.

¶ 15 The decedent's treating physician, Dr. Vincent Renzi, documented that in 1998 the decedent had come to his office complaining of forgetfulness, which did not subside following adjustment of his prescribed dosage of Flomax, a medication he took for prostatism. Thereafter, Dr. Renzi concluded that the decedent suffered from "progressive dementia" and prescribed Aricept, a drug approved only for the treatment of Alzheimer's Disease. Notwithstanding his medication regimen,

the decedent appeared for a follow-up appointment in January 1999 unbathed and looking "mildly disheveled." He could not remember what medications he was to take or what conditions they were prescribed to treat. Upon administering a Mini–Mental Status Examination (MMSE), Renzi determined that the decedent performed substantially below average for a man of his age and suffered from a cognitive deficit. Dr. Renzi's notes, dated 20 months prior to the opening of the ITF account, indicate that the decedent could not name three common objects and that he scored only 22 of a possible 30 points on the MMSE. Unfortunately, the decedent did not acknowledge his impairment and refused to continue taking Aricept.

¶ 16 The Estate's medical expert, Dr. Joel Streim, testified further concerning the decedent's performance on the MMSE and evaluated the decedent's condition in light of medical records compiled during the decedent's treatment as well as statements made by the decedent's friends and neighbors. Concerning the MMSE, Streim explained that a score of 28 is average for a man of the decedent's age, and that the decedent's score of 22 in January 1999 was consistent with mild dementia. Streim explained further that patients suffering from dementia typically lose two to three performance points on the MMSE per year. He concluded accordingly that by the first half of 2000, the decedent likely suffered from moderate dementia that would have been "sufficiently apparent to most laypersons to raise concerns about his mental condition." Report of Joel E. Streim, M.D., Exhibit P–66. Dr. Streim recounted further that, as little as six weeks after the decedent opened the ITF account, his MMSE score had declined to 2, and a CT scan of his head showed "brain atrophy with enlarged sulci" consistent with the progress of demen-

tia over months or years. Report of Joel E. Streim, M.D., Exhibit P–66.

¶ 17 The Estate introduced additional testimony from lay witnesses whose recollection of the decedent's appearance and demeanor confirmed Dr. Streim's assessment of the decedent's mental decline. Roxanne Rivera, the assistant manager of Sharon Savings, testified that between 1997 and 2000, the decedent had made monthly visits to Sharon Savings to conduct business. She observed further that during the early months of 2000, the decedent began to engage in erratic behavior, coming to the bank nearly every day and requiring that bank employees spend a significant amount of time explaining his finances and assuring him that his money was not being stolen. Rivera also noticed a change in his demeanor and appearance; he became "straggly" and unkempt and sometimes merely came into the bank and sat, interacting with no one. Rivera opined further that the decedent "wasn't there. He wasn't. His mental capacity was gone." N.T., 11/4/02, at 159.

¶ 18 Multiple witnesses attested to subsequent occurrences during which the decedent was found wandering about the neighborhood in a state not entirely lucid. Approximately one month after he opened the ITF account, the decedent was escorted by a police officer to the home of a friend after the officer found him locked out of his home. That same month, on four occasions, the decedent wandered into St. Agnes Hospital confused and in need of care. Ultimately, he was admitted with a diagnosis of dementia but then left the hospital against medical advice. Three days later, on September 22, 2000, the decedent made his way to a local retirement home and sought admission. The home's administrator, Florence Curley, remembered that the decedent was dirty and unkempt and told her that people were

trying to steal his money. He then presented Curley with the duplicate passbook from Prudential Savings Bank and told her that he could pay for his care, but asked her not to steal from him. The decedent was admitted, but shortly thereafter left the facility. Curley began to search for him and ultimately found him in a confused state trying to gain entry to his home, for which he did not have keys. She helped him gain entry and found the home in a state of squalor, smelling of urine, with trash and unopened mail strewn about the dwelling. Curley then convinced the decedent to return to the retirement home. In March 2001, the Orphans' Court adjudicated the decedent incompetent and in June 2001 he died.

¶ 19 Under similar circumstances we have found the evidence legally sufficient to establish "weakened intellect" and have affirmed the trial court's finding of undue influence. *See Estate of Lakatosh*, 441 Pa.Super. 133, 656 A.2d 1378, 1385 (1995) (finding weakened intellect established by competent evidence where testimony showed that decedent had been "out of touch" with reality and had been found living "in filth"); *Burns*, 595 A.2d at 1157–60, 1163 (finding evidence sufficient to establish weakened intellect where parties produced competing medical testimony on question of whether testator had suffered from Alzheimer's Disease in the final years of his life). A similar conclusion is apparent here. We find no merit in Prudential's assertions to the contrary. Although the bank most assuredly sought to undermine the Estate's case through the testimony of the witnesses it chose to present, the Orphans' Court acted well within its proper purview in rejecting countervailing testimony on the basis of credibility. *See Clark*, 334 A.2d at 634; *Burns*, 595 A.2d at 1163. Consequently, we find no error in the Orphans' Court's determination that

the decedent suffered from a weakened intellect when he opened the ITF account.

¶ 20 The evidence is equally sufficient to sustain the Orphans' Court's finding that Mazzei and Squitieri were engaged in a confidential relationship with the decedent. Our decisions provide extensive discussion on the nature of confidential relationships and the evidentiary thresholds necessary to establish their existence.

Our Supreme Court has acknowledged that "[t]he concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." *In re Estate of Scott*, 455 Pa. 429, 316 A.2d 883, 885 (1974). The Court has recognized, nonetheless, that "[t]he essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." *Id.* Accordingly, "[a confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]" *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412, 416–17 (1981) (emphasis added).

*Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa.Super.2001). Recognizing a wide array of relationships that might create such a discrepancy, our courts have been circumspect in limiting the circumstances under which a confidential relationship might be deemed to arise. *See Young v. Kaye*, 443 Pa. 335, 279 A.2d 759, 763 (1971) (cautioning that confidential relation "is not restricted to any specific association of persons nor confined to technical cases of fiduciary relationship but is deemed to exist whenever the relative position of the parties is such that one has power and

means to take advantage of or exercise undue influence over the other"). Thus, our courts have recognized consistently that the relationship may be indicated whenever a party in a superior position engenders the other's trust "and purports to act or advise with the other's interest in mind." *Basile,* 777 A.2d at 102 (quoting *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412, 418 (1981)).

¶ 21 Prudential appears to argue that the record in this case fails to establish the element of reliance implicit in the foregoing standards. Rather, Prudential asserts, "the evidence established that the relationship between Decedent and Prudential was nothing more than the kind of business relationship that one would expect between a small community bank and its customer." Brief for Appellant at 15. Prudential contends further that "[m]ere assistance in handling the details of business transactions does not give rise to an inference of confidentiality." Brief for Appellant at 15 (citing *In re Estate of Scott,* 455 Pa. 429, 316 A.2d 883, 886 (1974)) (boldface removed). This argument, like those we have already addressed, depends for its substance on evidence the trial court did not credit. *Compare* Brief for Appellant at 15 n. 5 (relying on Mazzei's testimony) **with** Trial Court Opinion, 5/5/03, at 29 (concluding that "material falsehoods" in their testimony "lead the Court to entirely disregard Mazzei's and Squitieri's testimony"). Thus, this argument appears calculated to revisit evidentiary weight and, to that extent, is beyond the proper purview of appellate review. *See Matter of Estate of Ross,* 316 Pa.Super. 36, 462 A.2d 780, 782 (1983) ("Credibility of the witnesses is for the hearing judge who has seen and heard them[.]").

¶ 22 To the extent that Prudential's argument addresses evidentiary sufficiency, we find it meritless. Initially, we note that the case on which Prudential places its principal reliance is readily distinguishable. Brief for Appellant at 14–16 (citing *Scott,* 455 Pa. 429, 316 A.2d 883, 886). In *Scott,* the decedent, although physically infirm, had retained sufficient mental capacity to direct her own affairs and had continued to do so in substantial measure, employing others merely to act at her direction. *See* 316 A.2d at 886. The court recognized accordingly that the evidence provided no basis on which to discern a confidential relationship. *See id.* ("Physical limitations imposed on a party to a transaction by disease and advancing age do not by themselves create a confidential relationship with another; such limitations support an inference of confidentiality only insofar as they may bear on a party's capacity to understand the nature of the transaction in question."). As we have discussed, the evidence in this matter demonstrated to the contrary that the decedent's understanding was substantially impaired by his condition of dementia. Consequently, *Scott,* and cases like it that focus on a decedent's *physical* debility before death as grounds for a finding of confidential relationship, provide only limited guidance for disposition of the issue in this case.

¶ 23 Here, the evidence demonstrated that the decedent, in a state of precipitous *mental* decline, reposed extraordinary trust and reliance in Mazzei and Squitieri, wholly consistent with the formation of a confidential relationship. Indeed, that trust is effectively recorded in the document Mazzei prepared for the decedent to sign, which directed, "I WISH TO PUT THE ACCOUNT **IN TRUST TO** FRANCES MAZZEI AND LUCIA SQIIERI [sic]." (emphasis added). Mazzei acknowledged that the decedent sought her advice on financial matters, that she gave him advice routinely, and that, ultimately, he would allow only Mazzei or Squitieri to

handle his transactions. She conceded further that the decedent opened the ITF account in response to her direction that in order to obtain direct deposit he would have to open a new account. N.T., 11/4/02, at 62–63. Once the account was opened and the substantial corpus of the decedent's assets transferred into it, the decedent allowed Squitieri to hold the passbook at Prudential's branch office. In each of these actions, the decedent evinced his trust in the two bank employees to provide effective stewardship of his life savings. In allowing them to hold the account passbook he granted them access to the account even as he ceded control himself. Although Prudential posits alternate explanations for some of these occurrences, we cannot discount the pattern of trust and reliance they document. Brief for Appellant at 15 n. 5 (attempting to dismiss use of phrase "in trust to" rather than "in trust for" in decedent's declaration of account as "simply a mistake"). Contrary to Prudential's assertions, these events establish far more than "[m]ere assistance in handling the details of business transactions." Brief for Appellant at 15 (citing *Scott,* 316 A.2d at 886) (boldface removed). Given the decedent's demonstrated incapacity prior to and after he opened the ITF account, they prove subjugation of the decedent's will and surrender of control over his assets. *See Scott,* 316 A.2d at 886. Accordingly, we find the evidence legally sufficient to establish a confidential relationship. The trial court did not err in so holding.

■ ¶ 24 Ultimately, Prudential attempts to argue that its witnesses disproved undue influence, a presumption of which arose upon the trial court's finding of weakened intellect and confidential relationship. *See Clark,* 334 A.2d at 632. Unfortunately, Prudential relies again on testimony that the trial court did not accept.

*Compare* Brief for Appellant at 24–27 (recounting testimony of Anthony Scarpa, Paul Perpiglia, and Nurse Giacobbe) *with* Trial Court Opinion, 5/5/03, at 29–30 (discounting the testimony of all three witnesses based on the limitations of their interactions with decedent). Moreover, it seeks merely to revisit the trial court's determination of weakened intellect and includes no attempt to rebut the presumption of undue influence, *per se.* Brief for Appellant at 24 ("It is difficult to comprehend how Judge O'Keefe found that Decedent had weakened intellect at the time he opened the ITF Account since not one of the many people to whom the decedent talked to [sic] at Prudential testified that Decedent exhibited, at any time, conduct which would lead one to believe that Decedent was not mentally competent to understand and make decisions on his own.") Prudential's unwarranted reproach of the trial court aside, its argument asks us merely to weigh testimony that we neither heard nor saw. *See Lakatosh,* 656 A.2d at 1381 (admonishing that "[i]t is not our task to try the case anew," particularly where trial court's findings are derived from assessment of credibility of witnesses that trial judge viewed in person). Accordingly, Prudential's argument addressing undue influence provides no basis for relief.

■ ¶ 25 In support of its third question, Prudential asserts that the trial court erred in holding the defendant bank vicariously liable for the acts of its employees. Brief for Appellant at 34. Prudential argues that vicarious liability may be established only in accordance with section 213 of the Restatement of Agency "if all of the requirements of an action of tort for negligence exist." Brief for Appellant at 34. We recognize that Restatement section 213 provides for imposition of vicarious liability only under limited circumstances. The

Restatement offers the following formulation:

### § 213. Principal Does Not Intend Conduct Or Consequences

A person conducting an activity through servants or other agents is subject to liability:

(a) if he is negligent in the conduct of such activity; or

(b) if he permits his servants or other agents to act negligently upon his premises or with his instrumentalities.

RESTATEMENT AGENCY § 213. Nevertheless, Prudential's discussion provides no cohesive analysis of the elements either of negligence or of section 213. Rather, it relies on summary conclusions concerning undue influence and the legal presumption in favor of testamentary disposition. These assertions are not sufficiently coherent to enable appellate review. Accordingly, we find no alternative but to deem the underlying issue waived. *See Lakatosh,* 656 A.2d at 1381 (declining to review question presented based on recitation of general statements not pertinent to issue under discussion).

¶ 26 Finally, in support of its fourth question, Prudential asserts that the trial court erred in finding the bank liable for negligence in supervising its employees. Brief for Appellant at 29. Prudential appears to argue that it cannot be found negligent on the evidence adduced because the Administrator failed to show that the bank violated any law, regulation, or written industry standard. Brief for Appellant at 31–33. Prudential argues in addition that our Supreme Court's jurisprudence effectively applies a "one-bite" rule to employer control of employee misconduct, such that the employer must have "reason to know of the necessity ... for exercising control ...." Brief for Appellant at 30 (quoting *Hutchison v. Luddy,*

560 Pa. 51, 742 A.2d 1052, 1055 (1999)). We find both arguments misdirected.

¶ 27 We acknowledge that the rule in *Hutchison* is binding in those cases where the record supports its application. Nevertheless, we find no discussion in Prudential's brief of how the record in this case demonstrates the rule's applicability. *Hutchison* recognizes the precept outlined in the Restatement (Second) of Torts entitled "Duty of Master to Control Conduct of Servant." *See* 742 A.2d at 1055. That provision defines an employer's duty "to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them ...." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 317). Prudential offers no discussion of how the conduct of its employees might be deemed "outside the scope of [their] employment" such as to render this rule applicable, nor can we discern any reason for such application.

¶ 28 In *Hutchison,* our Supreme Court applied the rule to define the potential liability of officials of a Roman Catholic diocese for the conduct of a priest who engaged in sexual activity with boys who attended his church or were members of his parish. *See id.* at 1053–54. Neither party disputed that such conduct was clearly outside the scope of employment of Roman Catholic clergy. In this case, by contrast, the activity of Mazzei and Squitieri that formed the basis for liability was demonstrably within their scope of employment; in point of fact, their employment allowed them to proceed undetected. In the absence of any substantial discussion by Prudential to show that such acts as the opening of new accounts and stewardship of funds were not within the course of its employees' duties, we find no basis for application of the foregoing rule.

¶ 29 Moreover, to the extent such a rule might be deemed to apply, the evidence established that Prudential's senior management knew precisely what Mazzei and Squitieri were doing even as they did it. Bank President Thomas Vento, whose testimony the trial court accepted, testified at length that Mazzei called him with the decedent present as she processed paperwork to open the ITF account and asked if she could title the account in the manner at issue. N.T., 11/6/02, at 35–42. He also acknowledged that, notwithstanding doubts he had about the transaction, he did not instruct Mazzei that she could not open the account. N.T., 11/6/02, at 47. Indeed, he gave her no instructions at all. N.T., 11/6/02, at 47. In view of this evidence, we find any assertion of lack of knowledge on the part of Prudential's senior management utterly meritless.

¶ 30 In addition, we find no merit in Prudential's assertion that the Administrator's failure to show that the Bank violated some law, regulation, or written industry standard should somehow insulate it from liability for negligence. Prudential's further appeal to provisions of Pennsylvania's Commercial and Banking Codes to demonstrate that it acted in accord with its statutory responsibilities is particularly wide of the mark. The Commercial Code defines a bank's authority "to accept, pay or collect an item or to account for proceeds of its collection" in the event of the death or incapacity of its customer. 13 Pa.C.S. § 4405(a) (Death or incapacity of customer). The Banking Code makes similar provisions concerning jointly held accounts. *See* 7 Pa.C.S. § 604(b)(1). However, neither provision is even remotely relevant to the issue of whether Prudential acted negligently in supervising its employees under the circumstances of this case. The trial court's disposition was wholly unrelated to whether Prudential

properly accepted, paid or collected an item. Nor did the court premise the liability of the bank on negligence in supervising employees in the way they carried out such tasks. Rather, as the trial court made amply clear, it premised liability on the fact that Prudential "negligently allowed the ITF Account to be created, and then negligently permitted Mazzei and Squitieri to dissipate assets." Trial Court Opinion, 5/5/03, at 34. The courts' findings and conclusions on this point are fully supported by the evidence and provide no basis for a claim of reversible error.

¶ 31 For the foregoing reasons, we conclude that Prudential is not entitled to relief on the claims it has asserted. Accordingly, we affirm the order of the Orphans' Court.

¶ 32 Order AFFIRMED.