J-A31018-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ERICA FLEAGLE LEACH | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| PEGGY A. DAVIS | |
| Appellee | No. 760 MDA 2014 |

Appeal from the Order April 8, 2014
In the Court of Common Pleas of Franklin County
Civil Division at No(s): 2011-437

BEFORE:  BOWES, J., OTT, J., and STABILE, J.

MEMORANDUM BY OTT, J.:                    **FILED FEBRUARY 05, 2015**

Erica Fleagle Leach appeals from the order entered April 8, 2014, in the Franklin County Court of Common Pleas, granting summary judgment in favor of defendant, Peggy A. Davis.  In this action, Leach sought to invalidate an *inter vivos* transfer of a deed to a 110-acre farm[1] from her grandfather,[2] Ira M. Fleagle (herein "the decedent") to Davis, who is Leach's aunt and the decedent's daughter.  On appeal, Leach argues the trial court abused its discretion in granting summary judgment to Davis because the

_____

[1] Throughout the proceedings, the acreage of the farm was referred to as 110, 125 or 137 acres.  For purposes of this appeal, we will refer to the total acreage as 110 acres, as that is the amount that appears in Leach's amended complaint, and Davis's answer.  **See** Plaintiff's Amended Complaint, 3/22/2013, at ¶ 4; Answer to Amended Complaint, 4/17/2013, at ¶ 4.

[2] Leach's father, who was the decedent's son, died in 1978.

deed transfer (1) constituted an invalid *inter vivos* gift; (2) was the result of undue influence; (3) created a constructive trust; or (4) created a resulting trust. For the reasons set forth below, we reverse, in part, the order granting summary judgment, and remand for further proceedings.

The facts underlying this appeal are as follows. Davis and Leach are the decedent's sole legal heirs.[3] The decedent owned a 110-acre farm about a mile from his house. Shortly after his wife's death, the decedent began a relationship with Mary Hoover. The decedent routinely stayed at his home during the week, and spent the weekends with Hoover. In 2004, he moved into Hoover's home full-time. He lived with her until his final hospitalization in October of 2010.

During all but 11 years of her life, Davis lived at the decedent's home.[4] Sometime in the mid-1980's, the decedent set up a joint bank account with Davis and relied on her to write checks and pay his bills.[5] Davis stated the decedent told her how much money he wanted each month and she

---

[3] **See** 20 Pa.C.S. §§ 2103, 2104. Davis is the decedent's only surviving child and Leach is the only daughter of the decedent's son. The decedent's wife died in 1968.

[4] Davis did not live at the home while she was married. In 1978, after she divorced, she and her sons moved into the decedent's home and lived there rent-free until his death.

[5] Hoover testified the decedent was semi-literate. **See** Deposition of Mary Hoover, 2/17/2012 ("M. Hoover Deposition"), at 11.

withdrew the cash for him. Deposition of Peggy Davis, 1/20/2012 ("Davis Deposition"), at 20. When the decedent lived at the home, Davis cooked meals for him, did his laundry and drove him to appointments, as needed. *Id.* at 43.

Leach described her relationship with the decedent as "somewhat distant due to our circumstances." Deposition of Erica Fleagle Leach, 1/20/2012 ("Leach Deposition"), at 8. She lived about an hour from the decedent's home, and saw him approximately four to five times a year. She stated that she sent him cards for special occasions, and called him "once every couple of months" when he lived with Hoover. *Id.* Leach admitted that "toward the end" she spoke more with Hoover because her grandfather had difficulty hearing. *Id.*

In October of 2010, the decedent suffered a heart attack and was hospitalized. Davis was initially informed by hospital staff that the decedent would be sent to a nursing home for rehabilitation. Concerned that the decedent could lose the family farm in order to pay for his stay in a nursing home, Davis asked him if he would sign the property over to her. She described their conversation as follows:

> [B]asically I told him that they were going to be sending him to a nursing home and I said about sometimes, you know, the property is attached if you run out of insurance money and would he be willing to sign the property over to me but it would still be his and he said, yes.

Davis Deposition at 36. Davis stated that the decedent wanted her to have the farm because he did not "want his land split up" and he knew she would "not do anything with it." *Id.* at 29.

On October 27, 2010, while still hospitalized, the decedent executed a deed conveying the 110-acre farm to Davis for $1.00 consideration. The transaction was completed and notarized at the decedent's hospital bedside by Heather Miller, a settlement agent for a title company. Thereafter, the hospital staff informed Davis the decedent would not be sent to a nursing home, but rather, would be sent home with hospice care. Two months later, on December 20, 2010, the decedent died, intestate, at the age of 86.[6]

On May 19, 2011, Leach filed a complaint for deed avoidance, seeking to invalidate the October 27, 2010, deed transfer of the decedent's farm. After deposing the relevant parties and all relevant witnesses, Leach filed an amended complaint on March 22, 2013. Thereafter, on June 12, 2013, she filed a motion for summary judgment, and followed by an amended motion on July 10, 2013. Davis subsequently filed a cross-motion for summary judgment on August 7, 2013. By order entered April 8, 2014, the trial court denied Leach's motion for summary judgment and granted Davis's motion

---

[6] Letters of administration were issued to Davis on March 23, 2011.

for summary judgment. Further, the court dismissed Leach's action with prejudice. **See** Order, 4/8/2014. This timely appeal followed.[7]

Although Leach lists 16 issues in the Statement of Questions Involved section of her brief, she raises only four claims in the Argument section. All of her contentions originate from the underlying claim that the trial court erred in granting Davis's motion for summary judgment.

When reviewing a motion for summary judgment, we "may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion." **Murphy v. Duquesne U. Of The Holy Ghost**, 777 A.2d 418, 429 (Pa. 2001), *citing* **Capek v. Devito**, 767 A.2d 1047, 1048, n.1 (Pa. 2001).

> As with all questions of law, our review is plenary. In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment.

**Keystone Freight Corp. v. Stricker**, 31 A.3d 967, 971 (Pa. Super. 2011) (internal citations omitted). **See also** Pa.R.C.P. 1035.2.

---

[7] On May 5, 2014, the trial court ordered Leach to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(b). Leach complied with the trial court's directive and filed a concise statement on May 20, 2014.

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. **If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied**.

***Jones v. Levin***, 940 A.2d 451, 453-454 (Pa. Super. 2007) (internal citations and footnote omitted) (emphasis supplied). In making this determination, we will "view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." ***Keystone Freight Corp.***, *supra*, 31 A.3d at 971.

In her first issue on appeal, Leach argues the trial court erred in rejecting her claim that the deed transfer constituted an invalid *inter vivos* gift. The two elements necessary to prove a valid *inter vivos* gift are (1) donative intent and (2) delivery. ***Hera v. v. McCormick***, 625 A.2d 682, 686 (Pa. Super. 1993). "Donative intent is the 'intention to make an immediate gift.'" ***Wagner v. Wagner***, 353 A.2d 819, 822 (Pa. 1976) (quotation omitted). To prove adequate delivery of a gift, the conveyance "must not only divest donor of all dominion and control over the property, but also must invest donee with complete control over the subject matter of the gift." ***Hera***, *supra*, 625 A.2d at 686 (citation omitted).

Initially, the burden is on the alleged donee to prove a gift inter vivos by clear, precise and convincing evidence. Once prima facie evidence of a gift is established, a presumption of validity arises and the burden shifts to the contestant to rebut this presumption by clear, precise and convincing evidence.

*Id.* (citations omitted).

Relevant to the facts of this case, we note that

a conveyance of real property by way of deed is **presumptively valid** and will not be set aside unless it is shown by clear and convincing evidence that the transfer was improperly induced by fraud or other misconduct on the part of the transferee or that the deed was ineffective to pass title, as, for example, where the deed was not delivered.

***Wagner***, ***supra***, 353 A.2d at 823-824 (Pa. 1976) (emphasis supplied). "[I]t is well-settled that by showing a confidential relationship between the donor and donee existed at the time of the gift, the burden then shifts to the donee to show that the gift was free of any taint of undue influence or deception." ***In re Clark's Estate***, 359 A.2d 777, 781 (Pa. 1976).

Here, Leach argues the transfer of the deed lacked both donative intent and delivery. She contends that because Davis admitted the decedent's motive for transferring the deed was not to gift the farm to her, but rather to avoid a future attachment on the property by a nursing home, the transfer lacked the requisite intent to make an immediate gift. Moreover, Leach also claims that because Davis told the decedent the property would still be his, the transfer did not constitute a valid delivery. Indeed, Leach states, "[a]t most [the decedent] viewed [Davis] as a trustee or conservator." Leach's Brief at 33.

The trial court rejected Leach's argument, finding that the requisite elements of donative intent and delivery were both satisfied upon transfer of the deed. The court explained:

> Upon execution of the deed, the Decedent was divested of all dominion and control giving such control to [Davis]. Further, donative intent was present upon signing on the deed, as such action evinces a manifestation of intent to convey the farm at the time of execution on October 27, 2010. [Leach] has not rebutted the presumption that the deed was a valid transfer of the farm. Therefore, the deed is *prima facie* evidence of a valid *inter vivos* transfer of property from the Decedent to [Davis].

Trial Court Opinion, 4/9/2014, at 24.

We agree with the trial court's determination that the execution of the deed constituted *prima facie* evidence of a presumptively valid gift from the decedent to Davis. **Wagner**, **supra**. The terms of the deed are clear: "Grantor [decedent] … does grant, bargain and sell, release and confirm unto said Grantee [Davis], as **sole owner**[,]" the farm property, described therein. Deed, 10/27/2010, at 1 (emphasis supplied). Moreover, the deed also provided that the land was "granted … unto the said Grantee, her heirs and assigns, forever." **Id.** at 3. Accordingly, under the deed's explicit terms, the decedent granted all his interest in the land to Davis, which became enforceable upon execution of the deed. Nevertheless, our inquiry does not end here, since, as noted above, a presumptively valid gift may be set aside upon clear and convincing evidence of undue influence. **Clark's Estate**, **supra**.

If a party contesting an *inter vivos* gift can demonstrate a confidential relationship existed between the grantor and grantee, "the burden shifts to the donee to show that the alleged gift was free of any taint of undue influence or deception." **Hera**, **supra**, 625 A.2d at 690. Although, here,

the trial court found Leach failed to produce sufficient evidence to demonstrate either that a confidential relationship existed between the decedent and Davis or that Davis asserted undue influence over the decedent,[8] Leach challenges those determinations in her second issue on appeal.

A presumption of undue influence arises when evidence of three elements is present: "(1) … a person … in a confidential relationship with a testator or grantor has (2) received a substantial portion of the grantor's property, and (3) that the grantor suffers from a weakened intellect." **Owens v. Mazzei**, 847 A.2d 700, 706 (Pa. Super. 2004) (citations omitted). "Once the presumption has attached, the burden of proof shifts to the defendant to disprove undue influence by clear and convincing evidence that one of the foregoing criteria is not established." **Id.**

This Court has explained that "[a] confidential relationship exists where the circumstances 'make it certain that the parties did not deal on equal terms; where, on the one side there is an overmastering influence, **or** on the other, weakness, dependence or trust, justifiably reposed.'" **Hera**, **supra**, 625 A.2d at 690 (citation omitted and emphasis supplied). Both an "overmastering influence" and "weakness, dependence or trust" need not be present. **Basile v. H & R Block, Inc.**, 777 A.2d 95, 101 (Pa. Super. 2001).

---

[8] **See** Trial Court Opinion, 4/9/2014, at 16-21.

"Th[is] Court has recognized … that '[t]he essence of [a confidential] relationship is trust and reliance on one side, and a corresponding **opportunity to abuse that trust** for personal gain on the other.'" *Id.* (emphasis supplied).

In the present case, Leach contends a "confidential relationship" existed between Davis and the decedent. She emphasizes that Davis controlled "the bulk" of the decedent's finances, providing him with an allowance and, in certain circumstances, withholding that allowance. Leach Brief at 37. Moreover, Leach argues Davis "spawned and designed the deeding" of the farm, "retained, directed and paid the scrivener, and was present when the deed was executed" while the decedent was "bedfast with dementia and other serious afflictions in the Intensive Care Unit of a hospital." *Id.* at 38.

The trial court found, however, "there [was] simply not enough evidence to evince a confidential relationship between the [d]ecedent" and Davis. Trial Court Opinion, 4/9/2014, at 18. Although the court acknowledged the decedent "trusted and relied on [Davis] to handle his money," it noted that "such a relationship is not out of the ordinary in a father-daughter relationship." *Id.* Moreover, the court discounted two disagreements about money the decedent had with Davis,[9] finding that

---

[9] These two disagreements are discussed in more detail *infra*.

those two instances did "not amount to [Davis] having an overmastering influence on the [d]ecedent." *Id.* Furthermore, the court concluded:

> The modicum of evidence favorable to [Leach] regarding a confidential relationship does not "make it certain that the parties did not deal on equal terms" when the [d]ecedent executed a deed in [Davis's] favor. Therefore, [Leach] cannot establish the existence of a confidential relationship between [Davis] and the [d]ecedent.

*Id.* at 19-20.

Viewing the evidence, as we must, in the light most favorable to the nonmoving party,[10] we are constrained to disagree with the trial court's conclusion. Rather, we find Leach produced sufficient evidence of a confidential relationship between Davis and the decedent to survive summary judgment, and establish a genuine issue of material fact.

The evidence demonstrated that Davis lived in the decedent's home since 1978, and had a joint bank account with the decedent since the mid-1980's. Davis Deposition at 12, 14. Davis testified she "wrote all the checks" on the account to pay his bills, and that the decedent permitted her to use the account to pay her own grocery bill as well. *Id.* at 15, 19. She also provided him with spending money from that account. *Id.* at 20-21.

Hoover, the decedent's longtime girlfriend, testified that Davis controlled the decedent's finances, and provided him with a monthly

---

[10] ***Keystone Freight Corp.***, ***supra***, 31 A.3d at 971.

allowance until June of 2010. M. Hoover Deposition at 8-9. She described two instances in which the decedent and Davis disagreed about money. The first occurred in June 2010, when Hoover took the decedent to get money from Davis. Hoover explained that Davis asked to see the decedent's wallet and, upon finding a significant amount of cash, took $1300 from him, and returned the wallet stating he "[didn]'t need it." *Id.* at 14. The second incident occurred sometime during the summer of 2010, when the decedent asked Davis for money to buy new clothes for Leach's September, 2010 wedding. *Id.* at 13. Davis gave him only $200 and told him "he didn't need a suit." *Id.* at 14.[11]

Furthermore, Davis admitted that she initiated the discussion regarding the deed transfer at a time when the decedent was hospitalized, in ill health, and believed he would be discharged to a nursing home. She asked him if he would deed the farm to her, purportedly to prevent its attachment by a nursing home, and told him that the farm would, in any event, still be his. *Id.* at 36. While Davis acknowledged the transaction was rushed, she testified she "just wanted the property, you know, taken care of before he went to a nursing home." *Id.* at 39.

---

[11] However, Hoover also acknowledged she and the decedent had another banking account, in their joint names, from which he wrote a $2,000 check as a gift to Leach for her September 2010 wedding. M. Hoover Deposition at 28.

While the evidence may not, ultimately, be of sufficient quality and quantity to support a verdict for Leach, that determination is a question for the fact finder. Here, the trial court prematurely weighed the evidence presented by Davis and Leach, and made credibility determinations regarding Davis's intentions. Rather, the court was required to view the evidence in the light most favorable to the non-moving party, here Leach, in an effort to determine whether Leach presented sufficient evidence for a jury to find that Davis and the decedent had a "confidential relationship," and whether there existed a genuine issue of material fact. *See Keystone Freight Corp.*, *supra*, 31 A.3d at 967; *Jones*, *supra*, 940 A.2d at 453-454. Based on our review of the record, there is a genuine issue of material fact as to whether Davis had an overmastering influence over the decedent, or whether the decedent trusted and depended on Davis.

The same is true of Leach's evidence concerning the decedent's "weakened intellect." When considering whether a decedent had a "weakened intellect,"

> [o]ur Supreme Court has cautioned that "weakened mentality as relevant to undue influence need not amount to testamentary incapacity." Consequently, the grantor's mental condition at the moment he authorized the transfer of his property is "not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. [When the challenge is based on undue influence,] more credence and weight may be given to the contestant's remote medical testimony." Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation.

- 13 -

*Owens v. Mazzei*, 847 A.2d 700, 707 (Pa. Super. 2004) (internal citations omitted).  However, it is axiomatic that "[e]vidence of physical infirmities … is not enough, alone, to establish weakened intellect."  *In re Estate of Glover*, 669 A.2d 1011, 1015 (Pa. Super. 1996) (finding will contestants failed to produce any evidence that decedent "suffered from spells of confusion, forgetfulness or disorientation" and, in fact, court found "[a]lmost every witness testified that [decedent] was extremely strong-willed, lucid and sharp").

Leach contends the evidence demonstrated the decedent had a weakened intellect.  Specifically, she emphasizes that the decedent was semi-literate, and in a "dire mental and physical condition on the days surrounding the deeding."  Leach's Brief at 38.

Conversely, the trial court found that the evidence presented by Leach may have "touch[ed] upon confusion, forgetfulness, or disorientation, but [did] not establish that the [d]ecedent was of less than sound mind[.]"  Trial Court Opinion, 4/19/2014, at 20.  Moreover, the court emphasized Leach's lack of medical testimony supporting the decedent's purported weakened mental state.  *Id.*  In fact, the only medical document of record appears to contradict Leach's claim.  That document, a report of a doctor's interview with the decedent two days before the decedent executed the deed transfer, indicates the decedent was "alert and oriented to person, time and place.

He [was] able to answer our questions." *See* Leach Deposition, Exhibit D-1, Initial Hospital/Consult RPT, 10/27/10, at 2.[12]

Again, viewing the record in the light most favorable to the nonmoving party, we conclude the trial court did not acknowledge evidence presented by Leach, which was sufficient to demonstrate, for purposes of summary judgment, that the decedent suffered from a weakened intellect. For example, Leach testified that when she visited the decedent in the hospital on October 19, 2010, a week before he signed the deed transfer, he was "a very sick man." Leach Deposition at 11. She explained their conversation was "[v]ery minimal" and the decedent "kind of just laid there and just looked at us." *Id.* More importantly, even Davis admitted that while the decedent was in the hospital, he would sometimes hallucinate, and see things on the wall, due to the medication he was given. Davis Deposition at 37. Both Hoover and her son, Roger, testified that during the last six months of his life, the decedent's physical and mental health were declining. M. Hoover Deposition at 15; Deposition of Roger Hoover, 2/17/2012 ("R. Hoover Deposition"), at 9. Roger explained that "sometimes [the decedent would] be lucid, then the next minute he wouldn't be[.]" R. Hoover Deposition at 12.

_____

[12] That same report, however, also indicates that "[a]ccording to [the decedent's] family physician, …[the decedent] is also progressively more disoriented and demented." *Id.* at 1.

Although the trial court emphasized the lack of medical evidence, none is required. *See In re Estate of Angle*, 777 A.2d 114, 123 (Pa. Super. 2001) (noting that "[a] doctor's opinion on medical incompetence is not given particular weight especially when other **disinterested witnesses** establish that a person with Alzheimer's disease was competent and not suffering from a weakened intellect at the relevant time.") (emphasis supplied). Indeed, Leach presented evidence, *via* two witnesses who had no interest in the farm, Hoover and her son, that the decedent's mental health was progressively declining in the months prior to his hospitalization. Moreover, Davis herself admitted that the medications the decedent received while he was hospitalized were causing him to hallucinate. The fact that the settlement agent, who had **not** met the decedent prior to the deed transfer, testified that she **thought** he "knew what was going on around him" is not dispositive.[13] Deposition of Heather Miller, 1/20/2012 ("Miller Deposition") at 16. Rather, when a challenge is based upon "weakened intellect" rather than "testamentary capacity," "more credence and weight may be given to the contestant's remote medical testimony." *Owens*, *supra*, 847 A.2d at 707 (citation omitted).

_____

[13] Specifically, when asked if the decedent was alert at the time of the deed transfer, Miller testified: "I think he knew what was going on around him, yes. I wouldn't say he was … bright-eyed and bushy tailed." Miller Deposition at 16.

Accordingly, we conclude the trial court abused its discretion, and improperly weighed the evidence, when it concluded Leach failed to establish a *prima facie* case of undue influence. **See Estate of Keiper**, 454 A.2d 31, 34 (Pa. Super. 1982) ("Transactions by which a decedent shortly before his death practically strips himself of all his available property are naturally regarded with suspicion, and are to be scrutinized with a keen and somewhat incredulous eye.") (citation omitted). Therefore, we are constrained to reverse the order granting summary judgment on this claim.

In her next issue, Leach argues the trial court erred in concluding she failed to present sufficient evidence that the deed transfer created a constructive trust. She contends that, by Davis's own words, the admitted motivation for the deed transfer was to prevent attachment of the property by a nursing home, which at best, constituted a unilateral mistake. Leach further asserts the decedent never intended to gift the farm to Davis.

When considering whether a property transfer creates a constructive trust, we must bear in mind the following:

> The imposition of a constructive trust is an equitable remedy designed to prevent unjust enrichment. A constructive trust arises '(w)here a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. . . .' A transferee is under such an equitable duty to reconvey property to the transferor **if the transfer was induced by** fraud, duress, **undue influence, or mistake, or if the transfer was the result of an abuse of a confidential relationship**.

*Yohe v. Yohe*, 353 A.2d 417, 421 (Pa. 1976) (internal citations omitted and emphasis supplied).

As we noted *supra*, we find Leach presented sufficient evidence of Davis's "undue influence" over the decedent to survive summary judgment. Accordingly, that same evidence, if credited by the fact finder, is sufficient to demonstrate that the deed transfer established a constructive trust. Indeed, by her own words, Davis assured the decedent that after the transfer, the property "would still be his." Davis Deposition at 36. Accordingly, this claim also survives summary judgment.

Lastly, Leach argues the deed transfer established a resulting trust. She contends that by Davis's own words, "any reasonable person would have to conclude that this was a trust type arrangement." Leach's Brief at 45. Leach argues the circumstances surrounding the deed transfer demonstrate that the decedent did not intend Davis to have a beneficial interest in the farm. *Id.* at 44.

A party must demonstrate the establishment of a resulting trust with clear and convincing evidence. *Chambersburg Trust Co. v. Eichelberger*, 588 A.2d 549, 551 (Pa. Super. 1991). "A resulting trust arises when a person makes a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have a beneficial interest in the property." *Fenderson v. Fenderson*, 685 A.2d 600, 604 (Pa. Super. 1996) (citations omitted). "A resulting trust must arise at the time title is transferred." *Id.* at 605.

Here, the trial court found that the circumstances on the date of the deed transfer did not raise an inference that "the [d]ecedent did not intend for [Davis] to have a beneficial interest in the farm at the time when he conveyed it to her." Trial Court Opinion, 4/9/2014, at 21. Indeed, he signed over the deed to her, exclusively. *See* Deed, 10/27/2010, at 1 (stating "Grantor … does grant, bargain and sell, release and conform unto said Grantee, as **sole owner**" the farm property) (emphasis supplied). We find no reason to disagree. Although there was some evidence that, at one time, the decedent intended to sell the property to his nephew,[14] there was no indication on the day of the title transfer, that the decedent intended to transfer less than a full beneficial interest in the property to Davis. Accordingly, the trial court properly granted summary judgment in favor of Davis on this claim.

Because we conclude the trial court abused its discretion in granting summary judgment on Leach's claims of undue influence and the establishment of a constructive trust, we reverse, in part, the order granting summary judgment, reinstate counts II and III of Leach's amended

_____

[14] *See* R. Hoover Deposition at 6-9; Deposition of Arthur Beidel, 2/17/2012, at 8; Deposition of Joseph Umbrell, 2/17/2012, at 5-6.

complaint, and remand for further proceedings. In all other respects, we affirm the order of the trial court.[15]

Order affirmed in part and reversed in part. Case remanded for proceedings consistent with this Memorandum. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/5/2015

---

[15] Leach presented the following eight counts in her amended complaint: (I) Lack of Testamentary Capacity and Incompetence; (II) Undue Influence; (III) Constructive Trust as to Real Estate; (IV) Resulting Trust as to Real Estate; (V) Bank Account Constructive Trusts; (VI) Bank Accounts Resulting Trusts; (VII) Accounting to Franklin County; and (VIII) Application of the Clean Hands Doctrine. **See** Plaintiff's Amended Complaint, 3/22/2013. In its April 9, 2014, order and opinion, the trial court disposed of all eight counts and dismissed Leach's complaint with prejudice. Therefore, with the exception of counts II and III, we affirm the court's order.