J-A17042-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF PEARL ROSE ANNA GROSS CAVANAUGH, DECEASED | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: LEE CAVANAUGH | : | No. 1872 WDA 2017 |

Appeal from the Order November 15, 2017
in the Court of Common Pleas of Cambria County,
Orphans' Court at No(s):  File No. 11-14-519

BEFORE:  OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED OCTOBER 05, 2018**

Lee Cavanaugh ("Lee") appeals from the Order declaring invalid the April 25, 2010 Last Will and Testament ("the 2010 Will") of Pearl Rose Anna Gross Cavanaugh, Deceased ("Decedent"), and directing that Decedent's Estate ("the Estate") be administered pursuant to Pennsylvania's intestacy laws.  We affirm in part, reverse in part, and remand with instructions.

Decedent died testate on July 10, 2013, at the age of 93.  Decedent was survived by three children, Linda Cavanaugh ("Linda"), Lois Cavanaugh Fischer ("Lois"), and Lee.[1]  At issue in this case are two wills that Decedent executed prior to her death.

The first will, executed on January 31, 2006 ("the 2006 Will"), appointed all three of Decedent's children as Executors of the Estate.  The 2006 Will

_____

[1] Decedent also had a fourth child, Robert Cavanaugh, Jr., who predeceased her.

devised Decedent's property located at 728 Lake Shore Drive, Friedens, Pennsylvania ("the lake house"), and the residue of the Estate, to her children in equal shares.[2] Additionally, the 2006 Will devised Decedent's residence at 122 Elknud Lane, Johnstown, Pennsylvania ("the residence"), to Linda, if she chose to live there; otherwise, the residence would be divided among her three children in equal shares.

On March 13, 2010, Lee sent an email to various family members, including Linda and Lois,[3] informing them that Decedent would be moving into his home in Mechanicsburg, Pennsylvania,[4] and noting that he had taken over

_____

[2] As the Orphans' Court pointed out in its Opinion and Order, Lee had sent a letter to Decedent on July 7, 2005, prior to her execution of the 2006 Will, detailing changes he believed should be made to her will, as well as his personal complaints against Linda and her husband. Relevantly, Lee asked to be appointed as the sole executor, and stated that it is not acceptable for Linda to be in charge of managing the lake house. *See* Opinion and Order, 11/15/17, at 2; *see also* Contestants' Exhibit D.

[3] The Orphans' Court stated in its Opinion, and Lee testified during the non-jury trial, that Lee also sent the email to David J. Schiller, Esquire ("Attorney Schiller"). *See* Opinion and Order, 11/15/17, at 2-3; *see also* N.T., 9/25/17, at 29-30. Lee had recommended Attorney Schiller to Decedent for the purpose of preparing her will. Lee additionally sent a letter to Attorney Schiller, wherein he stated that Decedent wished to establish a trust for each of the three children; outlined the terms of the proposed trust; and proposed that Lee manage all three trusts as the trustee, or alternatively, that he serve as trustee for his sisters' trusts, and that Lee's daughter serve as trustee for his trust.

[4] Decedent moved into Lee's home in early April of 2010.

the management of most of Decedent's investment accounts.[5] Lee also stated in the email that Decedent had indicated to him that she was considering making changes to her will. Specifically, Lee stated that Decedent "is seriously considering gifting [the lake house] to a Family Trust," and detailed the proposed terms of the trust. Linda replied to Lee's email, indicating that she had spoken with Decedent, and Decedent "didn't seem to be aware of this trust business."

Decedent executed the 2010 Will on April 25, 2010.[6] The 2010 Will made significant changes to the 2006 Will. Relevantly, the 2010 Will appointed Lee as the sole Executor and Trustee, and named Lee's daughters, Elizabeth and Lauren Rose Cavanaugh June ("Lauren"), as the first and second alternate Executors and Trustees, respectively. Under the 2010 Will, each of Decedent's three children would receive an equal share of the residue of the Estate (not including the lake house), together with any life insurance proceeds, to be held in a trust, and to be administered as follows:

> A. My Trustees shall pay all of the realized income from the separate trusts to my respective children in convenient installments, not less frequent than quarterly.

---

[5] Lee is a certified public accountant, and owns a company named PSI Investments.

[6] Decedent executed a Power of Attorney, and a Durable Health Care Power of Attorney, in Lee's favor on the same date. Lee's daughter, Elizabeth Lynn Cavanaugh Sweigart ("Elizabeth"), was named the alternate on both documents.

B. My children can individually elect at any time to receive additional monies based upon an annual amortization of the principal and all realized income based on each child's individual life expectancy with the assumption that death will occur at age 100, disregarding actual life expectancy. The Trustee shall amortize the principal sum each January 1st and make periodic payments with adjustments made annually based upon any growth or losses in the principal and the remaining life expectancy, as described above. Any child can elect to receive the amount determined as described in this paragraph; the amount described in the prior paragraph or any amount in between and shall notify the Trustee of their decision. However, to the extent that any child receives less than the maximum permitted amount, there shall be no permitted "make up" of amounts that could have been taken but were not. …

C. In addition to the provisions of subparagraph (B) for distribution of principal, my Trustees may pay, from time to time, **as determined in my Trustee's sole discretion**, from the principal of the separate trusts such amounts to, or for the benefit of, my respective children, as my Trustees in their absolute discretion may deem appropriate to provide for the support, education, medical care, other need, or a comfort of my respective children. **There is no requirement that my Trustees treat my beneficiaries equally**, so distributions under this [s]ubsection may be made unequally and **without any standard or criteria**, other than as described above.

D. In the event any child of mine should die before the entire principal of his or her separate trust has been distributed or expended, the remaining principal of such trust shall be distributed to the child's issue outright. In the case of the Trust held for [Linda], her separate trust shall be distributed to the trusts of her siblings. If either sibling is not living, the assets shall pass to the children of the deceased sibling.

The 2010 Will, 4/25/10, at 2-3 (emphasis added). Additionally, the 2010 Will directed that the lake house be contributed to a trust, and appointed Lee as Trustee. The 2010 Will set forth the following provisions for the administration of the lake house trust:

All descendents [*sic*] of Lee Gross and Dorris Gross[,] except Carol Gross and Jon Gross[,] shall benefit under the Trust (herein "beneficiaries"). All beneficiaries must be at least age 18. Stepchildren and adopted children of beneficiaries are only included as beneficiaries if elected in writing by at least 40% of the then-existing beneficiaries.

During the thirty (30) day period following establishment of the Trust and during each succeeding December, all descendents [*sic*] can elect to actively participate in the Trust as an active member for the succeeding year. Any descendent [*sic*] choosing to be active shall pay an equal portion of the expenses of maintaining the real estate and improvements including real estate taxes, maintenance, utilities, insurance and any and all other expenses as well. The Trustees shall establish an escrow fund to require the accumulation of funds for major repairs and capital improvements to the property. All active members shall be entitled to an equal vote on any capital improvements (but not routine maintenance) desired on the property. The Trustee shall calculate all contributions made by active members over the years.

Upon any sale of the property, sale proceeds shall first reimburse any descendents [*sic*] who were active at any time if they are then-living and such reimbursement shall be an amount equal to their prior contributions, with interest calculated from each contribution at the rate of five percent (5%) per annum. All contributions beginning January 1, 2010[,] shall count for all purposes hereunder. If sale proceeds are not adequate to reimburse all prior contributions, they shall be reimbursed on a pro[]rata basis so that all people reimbursed receive the same percentage of the monies they contributed.

All descendents [*sic*] shall be entitled to have use of the property **based upon a schedule created by the Trustee**. All use is conditioned upon maintaining and leaving the property in excellent condition. **The Trustee may preclude use of the property by any beneficiary who is not meeting the aforementioned requirements**.

If the active members do not adequately support the property, the Trustee shall immediately sell the property. If any one beneficiary is willing to pay the costs of maintaining the property, the property shall not be sold. After reimbursing all prior

contributions … any sale proceeds shall be divided equally among the beneficiaries who are at least age 18 and meet the "use requirement." The use requirement is that the beneficiary must have spent a minimum of four nights at [the lake house] with utilization of the property on at least part of the previous and succeeding day for enjoyment or work on the property in every two successive calendar years. Furthermore, if the Trustee does not meet the use requirement, the beneficiaries may elect to change Trustees. The Trustee shall keep a log of use by the beneficiaries and such log records shall be determinative.

*Id.* at 3-5 (emphasis added). Notably, in the section titled "Administrative Powers," the 2010 Will also allows the Executor and Trustee to "retain as an investment any asset" of the Estate and to make investments, and specifically authorizes the Executor and Trustee "to use and pay for the services of PSI Investments[, *i.e.*, Lee's company,] for these purposes." *Id.* at 7.

The following day, Lee sent an email to inform the family that Decedent had signed the 2010 Will, and asked them to "weigh in" if they had any issues. Linda replied to the email, including comments on the 2010 Will, and expressing concerns that the 2010 Will was "one-sided and unfair." Following additional email exchanges, Lois also expressed her concerns with the 2010 Will.

On May 28, 2014, nearly a year after Decedent's death, Linda and Lois (collectively, "Contestants") filed a Caveat with the Register of Wills, asking the Register of Wills to refuse to probate the 2010 Will. Specifically, Contestants alleged that (1) Decedent "was not of sound mind, memory or understanding" prior to and on the date of execution of the 2010 Will, and (2) execution of the 2010 Will was the result of undue influence by Lee. On the

same date, Contestants filed a Petition for Citation to Show Cause in the Orphans' Court, asserting that Lee was in possession of the 2010 Will, but had not deposited the 2010 Will with the Register of Wills or requested letters testamentary for the Estate. Contestants therefore asked the Orphans' Court to issue a citation directing Lee to show cause why the 2010 Will should not be deposited. The Orphans' Court subsequently issued a Decree, directing Lee to show cause why the 2010 Will should not be deposited with the Register of Wills, and scheduling a hearing on the matter.

On October 24, 2014, the parties entered into a Stipulated Order, which provided, *inter alia*, that (1) Lee, Elizabeth and Lauren were to renounce their respective rights to serve as Executor and Trustee under the 2010 Will in favor of Gerald P. Neugebauer, Jr., Esquire ("Attorney Neugebauer"); (2) Attorney Neugebauer was to file a Petition for Letters of Administration for the Estate with the Cambria County Register of Wills; and (3) a $500 deduction from Lee's distribution from the Estate was to be made payable to Linda for attorneys' fees. Attorney Neugebauer subsequently filed a Petition for Letters of Administration *C.T.A.* for the Estate. On May 12, 2015, the 2010 Will was admitted to probate, and the Register of Wills issued Letters of Administration *C.T.A.* for the Estate to Attorney Neugebauer.

On May 15, 2015, Contestants filed an Appeal to the Orphans' Court, alleging that Decedent lacked testamentary capacity to execute the 2010 Will, and that Decedent had executed the 2010 Will as a result of undue influence by Lee. Contestants also raised concerns that Lee had taken actions on behalf

of the Estate without being granted letters testamentary, and had expended Estate assets. Lee filed a Response to the Appeal on June 5, 2015.

Following a pre-trial conference, the Orphans' Court entered a Case Management Order on November 3, 2015, directing Lee to transfer any Estate assets in his possession to Attorney Neugebauer. The Orphans' Court also ordered Lee to provide to Attorney Neugebauer any documents related to the value of the Estate assets, an accounting of all bills and invoices he had paid for the benefit of the Estate, and an accounting of all bills and invoices he had paid related to the lake house.

Both parties engaged in discovery. The Orphans' Court scheduled a non-jury trial for June 12-13, 2017, at which Lee and his counsel failed to appear. The Orphans' Court thereafter rescheduled the non-jury trial, and directed Lee's counsel to reimburse Contestants and their counsel for travel expenses.

Following the non-jury trial on September 25, 2017, the Orphans' Court ordered each party to file a "detailed memorandum," including proposed findings of fact, argument, and a proposed order. Both parties complied. The Orphans' Court issued an Opinion and Order on November 15, 2017, concluding that Decedent was subject to the undue influence of Lee, and declaring the 2010 Will invalid. The Orphans' Court also ordered that the Estate be administered pursuant to the intestacy laws of Pennsylvania.

Lee filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.[7]

On appeal, Lee raises the following issues for our review:

1. Was the evidence insufficient to sustain a requisite finding of diminished capacity or undue influence[,] and contrary to sufficiency standards set forth in *In re Ziel's Estate*, 467 Pa. 531, 540, 359 A.2d 728, 733 (Pa. 1976) ("contradicted testimony of occasional confusion or lapses of memory… is insufficient to demonstrate clearly and convincingly" either weakened intellect or testamentary incapacity.[])[?]

2. Was the [Orphans'] Court's decision inconsistent with the allocation of burdens of proof set forth in *In re Estate of Hastings*, 479 Pa. 122, 127, 387 A.2d 856, 867 (1978); [*In re Estate of Cohen*], 445 Pa. 549, 551 n.1, 284 A.2d 754, 755 n.1 (1971), *cited with approval* [in] *In re Estate of Kuzma*, 487 Pa. 91, 408 A.2d 1369 (1979)?

Brief for Appellant at 2.

We observe the following standard of review:

In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's

_____

[7] Because the Orphans' Court referred to the hearing in this matter as a non-jury trial, this Court issued a Rule to Show Cause on January 16, 2018, stating that Lee had failed to file post-trial motions within 10 days of the entry of the decision pursuant to Pa.R.A.P. 302(a), and questioning whether any issues had been preserved for appellate review. Lee filed a Response, stating that, pursuant to Pa.O.C. Rule 8.1, no post-trial motions may be filed. This Court subsequently entered an Order discharging the Rule to Show Cause.

findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

***In re Estate of Schumacher***, 133 A.3d 45, 49-50 (Pa. Super. 2016) (citation omitted).

We will address Lee's claims together.[8] Lee argues that the evidence did not support the Orphans' Court's determination that Decedent was subject to undue influence by Lee at the time she executed the 2010 Will, and that the Orphans' Court did not correctly apply the burdens of proof to the respective parties. **See** Brief for Appellant at 5-28.[9] Lee first points to Attorney Schiller's deposition testimony[10] that he believed Decedent to be of sound mind at the time she executed the 2010 Will. ***Id.*** at 9. Lee also points to the testimony of his wife and son, who witnessed Decedent's signature, that Decedent was of sound mind, and was able to speak her mind at the time the 2010 will was signed. ***Id.*** at 10. Additionally, Lee directs us to his own testimony that Decedent was "adamantly independent" before she moved into

---

[8] We observe that Lee failed to divide his argument "into as many parts as there are questions to be argued," as required by Pa.R.A.P. 2119(a).

[9] We also note that Lee does not clearly and specifically address each of the requirements of a *prima facie* showing of undue influence, and instead summarizes the testimony of each witness presented at the non-jury trial. Further, although Lee cites to relevant case law to define a challenge based on undue influence and the required findings, he fails to apply such case law to his own argument, or to explain why those cases support a finding that his actions in this matter did not constitute undue influence. **See generally** Pa.R.A.P. 2119(a).

[10] The parties stipulated to the admission of Attorney Schiller's March 1, 2016 deposition testimony at trial, and the transcript and video recording were admitted into evidence. **See** N.T., 9/25/17, at 87; **see also** Joint Exhibit 5.

his home, and that she was able to take care of herself and manage her own expenses. *Id.* at 12; *see also id.* at 13-14, 15, 16 (wherein Lee argues that even after Decedent moved into his home, she remained self-sufficient and could express her own opinions); *id.* at 17 (wherein Lee states that "[Decedent's] capacity did not decline until 2013[,] when it declined precipitously before her death."). Lee refers to his testimony that he believed that Decedent was competent to execute the 2010 Will. *Id.* at 13. Lee also states that Elizabeth's testimony confirms that Decedent's mental state did not deteriorate until 2013. *Id.* at 25. Further, Lee asserts that Contestants were not present when the 2010 Will was executed, and that neither of them presented evidence that Decedent exhibited confusion, forgetfulness or disorientation at any time prior to the execution of the 2010 Will. *Id.* at 7; *see also id.* at 18, 20, 25.

According to Lee, the evidence presented at trial confirmed that Decedent wanted to keep the lake house for use by future generations. *Id.* at 26. Lee argues that Contestants never sought to confirm Decedent's reduced capacity while she was alive, and states that they provided merely anecdotal evidence of her short-term memory problems. *Id.* Lee also points out that there was no medical evidence presented at trial concerning Decedent's mental capacity. *Id.* In sum, Lee contends that Contestants did not satisfy their burden of proof. *Id.* at 28.

"Any person 18 or more years of age who is of sound mind may make a will." 20 Pa.C.S.A. § 2501. "In making a will an individual may leave his or

her property to any person or charity, or for any lawful purpose he or she wishes, unless he or she lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion." ***In re Estate of Nalaschi***, 90 A.3d 8, 11 (Pa. Super. 2014) (citation and quotation marks omitted).

> The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof. Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence.

***In re Estate of Smaling***, 80 A.3d 485, 493 (Pa. Super. 2013) (internal citations, quotation marks, and footnote omitted); ***see also id.*** at 497 (stating that "[i]n order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind[, or] fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will." (citation and ellipses omitted)).

With respect to "weakened intellect," this Court has observed the following:

> The weakened intellect necessary to establish undue influence need not amount to testamentary incapacity. Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation. Moreover, because undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind, the fruits of the undue influence may not appear until long after the weakened intellect has been played upon. Accordingly, the particular mental condition of the testator on the date he executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. More credence may be given to remote mental history.

*Id.* at 498 (internal citations and quotation marks omitted).

During the non-jury trial, Linda testified that, beginning in approximately 2009, when Decedent was still living at the residence, Decedent no longer cleaned up after her dog consistently, and on one occasion left the dog outside overnight. *See* N.T., 9/25/17, at 111. Linda testified that in approximately 2010, but before Decedent had moved in with Lee, she noticed that Decedent "seemed to be getting forgetful." *Id.* at 112. Linda also stated that Decedent started to repeat herself during that time. *See id.* at 113.

Lois testified that, during a visit by Decedent in approximately October of 2010, she noticed that Decedent "was starting to lose it." N.T., 9/25/17, at 94. Lois explained that Decedent displayed short-term memory loss and confusion. *See id.* at 94-95. Lois also referred to an email from Lee dated May 22, 2010 (approximately one month following the execution of the 2010

Will), and her response thereto. *See id.* at 99; *see also* Contestants' Exhibit R (March 22, 2010 email). In her response to Lee's email, Lois stated that "[Decedent] is not herself and getting worse every time I talk to her. She tells me something and a minute later tells me the same thing again." Contestants' Exhibit R (May 22, 2010 email).

Lee testified that he began making investments on behalf of Decedent in approximately 2006. *See* N.T., 9/25/17, at 16. Lee also confirmed that the letter he sent to Decedent on July 7, 2005 accurately reflects how he felt about Decedent's will, and provisions that should be included, both at the time he drafted the letter and at the time of trial. *Id.* at 18-20. According to Lee, Decedent's residence was "unfit for human habitation" by approximately 2008 or 2009. *Id.* at 35; *see also id.* at 25-26 (wherein Lee explained that the residence was "very smelly;" "the dust bunnies were like dust lions they were so big;" and the residence was generally unclean). Lee testified that Decedent had not showed signs of forgetfulness, and that he did not observe any inability by Decedent to remember things at the time she executed the 2010 Will. *See id.* at 39-40, 57. Lee also testified that Decedent's mental state did not deteriorate until 2013. *See id.* at 42, 44, 83.

Additionally, the Orphans' Court set forth the following Findings of Fact regarding Lee's testimony about Decedent's mental state:

13. In a prior deposition,[11] [Lee] testified that he took financial matters over for [Decedent] as soon as she moved in with him in 2010[;] he also indicated that she was not capable of doing so on her own.

14. When asked about Decedent's mental state at trial, [Lee] indicated she was sharp as ever when she moved in with him[,] and when challenged about the inconsistency with the prior deposition referenced above, he qualified his response to say that he had meant she was not capable of managing her finances in 2013[,] not in 2010.

15. Despite [Lee's] qualification[,] we found his testimony to be not credible in regards to [Decedent's] mental state when she moved in with him.

Opinion and Order, 11/15/17, at 3-4 (footnote added; citations to record omitted); *see also* Joint Exhibit 1.

Here, the Orphans' Court determined that Contestants had presented sufficient evidence to establish that Decedent had a weakened intellect at the time she executed the 2010 Will. **See** Opinion and Order, 11/15/17, at 6; **see also id.** at 5 (wherein the Orphans' Court specifically credited Lois's response to Lee's May 22, 2010 email, as it was sent prior to the commencement of litigation). Upon review, we conclude that the Orphans' Court's findings are supported by competent evidence. **See In re Estate of Smaling**, 80 A.3d at 498; **see also Owens v. Mazzei**, 847 A.2d 700, 707

---

[11] Upon agreement by the parties, the transcript of Lee's March 22, 2013 deposition testimony was admitted into evidence at trial. **See** N.T., 9/25/17, at 87; **see also** Joint Exhibit 1 (Lee's March 22, 2013 deposition) (wherein Lee testified that "[Decedent] is never the same in any given two moments, let alone two days. She might come out … and say where am I and why am I here? … And then the next time she comes out, she might be totally coherent. … But she gets a little more that way with every passing month.").

(Pa. Super. 2004) (stating that "[i]f the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions."). Further, to the extent that Lee asks us to reassess the credibility of the testimony presented during the non-jury trial, we decline to do so. *Owens*, 847 A.2d at 707 (stating that "[u]nder no circumstance will we substitute our judgment of credibility for that of the Orphans' Court.").

With regard to a confidential relationship, our Court has stated the following:

> [A] confidential relationship exists when the circumstances make it certain that the parties did not deal on equal terms, but on the one side is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. A confidential relationship is created between two persons when it is established that one occupies a superior position over the other—intellectually, physically, governmentally, or morally—with the opportunity to use that superiority to the other's disadvantage. Such a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor as reasonably to inspire confidence that he will act in good faith for the other's interest.

*In re Estate of Smaling*, 80 A.3d at 498 (internal citations, quotation marks and brackets omitted). Additionally,

> [w]here a testator, although possessed of testamentary capacity[,] is aged, infirm bodily, with mental faculties impaired, as against a confidential adviser who is a **beneficiary** under the will, there is a presumption of fact that undue influence was brought to bear on the mind of the testator, and the burden is on the beneficiary to rebut the presumption.

*In re Estate of Stout*, 746 A.2d 645, 648 (Pa. Super. 2000) (citation and brackets omitted; emphasis in original). "The clearest indication of a

confidential relationship is that an individual has given power of attorney over her savings and finances to another party." *In re Estate of Fritts*, 906 A.2d 601, 608 (Pa. Super. 2006). However, the existence of a power of attorney in the proponent's favor does not, without more, establish the existence of a confidential relationship. *See In re Estate of Luongo*, 823 A.2d 942, 964 (Pa. Super. 2003). Similarly, a parent-child relationship between the decedent and the proponent is not sufficient *per se* to establish the existence of a confidential relationship. *See id.*; *see also Estate of Gilbert*, 492 A.2d 401, 404 (Pa. Super. 1985) (stating that "[a]lthough a parent-child relationship does not conclusively suggest a confidential relationship, it is a fact to be considered.").

During the non-jury trial, Lois stated that before Decedent moved in with Lee and his family, she spoke to her mother on the phone about once a week. *See* N.T., 9/25/17, at 90. Lois also testified that after Decedent moved, her ability to communicate with Decedent decreased, and they spoke "[p]robably only once every couple weeks." *Id.* at 97; *id.* (wherein Lois explained that sometimes when she called Lee's house no one answered, and that Decedent no longer initiated phone calls). Lois testified that she and Decedent did not have any discussions regarding Decedent's desire to change her will in the month prior to moving to Lee's home. *See id.* at 96. Further, Lois stated in her response to Lee's May 22, 2010 email that Decedent had told Lois that she did not read the will. Contestants' Exhibit R (May 22, 2010 email); *see also* N.T., 9/25/17, at 99-100 (wherein Lois explained that

Decedent had indicated during a telephone conversation with Lois that she did not read the 2010 Will, and that Decedent had always told Lois that "everything was left equally").

Linda testified that she saw or spoke to Decedent almost every day before Decedent moved to Lee's house, and that after the move, she and Decedent spoke on the phone about once a week. *See* N.T., 9/25/17, at 108, 112. Additionally, Linda spoke with Decedent shortly after receiving Lee's March 13, 2010 email, and according to Linda, Decedent did not seem to be aware of any discussion with Lee regarding the trust. *See id.* at 117; *see also id.* (wherein Linda testified that Decedent told her that she "wanted to dump the cottage"); *see also* Contestants' Exhibit F (March 13, 2010 email) (wherein Linda, responding to Lee's email, stated that she had spoken to Decedent; Decedent stated that she wanted to "dump" the lake house; and Decedent "didn't seem to be aware of this trust business."). Linda also testified that Lee did not contact her prior to Decedent's execution of the 2010 Will, and that Lee never sent her a final, signed copy of the 2010 Will. *See* N.T., 9/25/17, at 119.

Lee testified that he and Decedent had discussed Decedent's will "from time to time" before she moved into his house. *Id.* at 20-21, 27. Lee testified that he had "constantly" had discussions with Decedent during which he asked her to move in with him and his family, and that he usually initiated those conversations. *Id.* at 24-25. Lee also stated that he began paying Decedent's bills directly from her account after she moved in with him. *See id.* at 39.

According to Lee, he read the 2010 Will to Decedent, and reviewed it with her "word for word" prior to the day of signing, because her ability to read the document herself was impeded by cataracts. *See id.* at 57-58; *see also id.* at 63. Lee testified that Attorney Schiller reviewed the 2010 Will with Decedent before she signed it. *See id.* at 58. However, Lee also stated that he "specifically did not want to be" present when Attorney Schiller and Decedent reviewed the 2010 Will, so he left the room at that time. *See id.*

> The Orphans' Court set forth the following Findings of Fact:
>
> 9. The changes to be made to the will outlined in this [March 13, 2010] email by [Lee] and his testimony that they were the wishes of the Decedent are not credible when viewed in light of his letter of July 7, 2005, the [2006] Will …, the letter he sent to Attorney Schiller and his status as a financial planner.
>
> 10. The [c]ourt finds from the testimony and evidence submitted that [Lee] wanted the Decedent's will to be changed and that he took affirmative steps to do so beginning in March of 2010 when he contacted Attorney Schiller.
>
> 11. Attorney Schiller indicated that it was Lee who initiated the call to him regarding changes to the Decedent's will in 2010.
>
> 12. Attorney Schiller stated that he never had any conversations or meetings with the Decedent, that he could recall, at his office or on the phone **<u>PRIOR</u>** to the execution of the [2010 W]ill on April 25, 2010.
>
> …
>
> 16. Based on the depositions of [Attorney] Schiller and [Lee] we find that the Decedent never met or spoke to Attorney Schiller in private or without the direction of [Lee] prior to her execution of the [2010 W]ill on April 25, 2010.
>
> 17. Based on the email correspondence sent out by [Lee] indicating drafting changes suggested by [Contestants] and

> responded to by [Lee] **AFTER** the [2010 W]ill had already been executed by the Decedent on April 25, 2010, we do not credit [Lee's] testimony regarding the events surrounding the drafting and execution of the [2010 W]ill.
>
> 18. On the whole, [Lee's] testimony was self-serving and inconsistent; at times when it seemed to bolster his case he remembered things clearly and unequivocally[,] and at times when it seemed to weaken his case he could not recall details surrounding the drafts and review of the April 25, 2010 [W]ill with [Decedent].

Opinion and Order, 11/15/17, at 3, 4-5 (emphasis in original; citations to record omitted).

A review of the record confirms that Decedent moved into Lee's home, at his suggestion, less than a month before the 2010 Will was executed. On the date Decedent executed the 2010 Will, she was 90 years old, had decreased contact with her other children, and—as discussed above—had a weakened intellect. ***See, e.g.***, Opinion and Order, 11/15/17, at 5 (wherein the Orphans' Court specifically credited Lois's response to Lee's May 22, 2010 email, and Linda response to Lee's March 13, 2010 email, as both were sent prior to the commencement of litigation in this matter). Additionally, Lee, a beneficiary under the 2010 Will, was Decedent's primary caregiver and managed her finances at that time. ***See Fritts***, 906 A.2d at 608; ***see also Stout, supra***; ***Burns v. Kabboul***, 595 A.2d 1153, 1163-64 (Pa. Super. 1991) (concluding that there was sufficient evidence to establish a confidential relationship where the proponent of the will was the decedent's primary caretaker, was entrusted with a power of attorney to carry out banking transactions on the decedent's behalf, and was the scrivener of the will that

left her the bulk of the estate). Lee also chose Attorney Schiller to draft the 2010 Will, and he alone communicated with Attorney Schiller regarding the proposed changes. *See generally Burns*, 595 A.2d at 1163 (stating that "[i]t will weigh heavily against the proponent on the issue of undue influence when the proponent was either the scrivener of the will or was present at the dictation of the will."). Thus, upon review, we agree with the Orphans' Court's determination that Contestants presented sufficient evidence to establish that a confidential relationship existed between Lee and Decedent. *See* Opinion and Order, 11/15/17, at 6.

With regard to the third prong of the undue influence test, "'[s]ubstantial benefit' has not been precisely defined in our case law." *In re Estate of Smaling*, 80 A.3d at 497. Instead, the Orphans' Court must consider the circumstances of each particular case. *Id.*

Here, the 2010 Will generally divides any life insurance proceeds and the residue of the Estate, notwithstanding the lake house, equally among Decedent's three children. However, Lee's status as the sole Executor and Trustee under the 2010 Will "gives [him] control and mastery over Decedent's Estate to the exclusion of the [Contestants]. This fact is acknowledged by [Lee] in his email of May 4, 2010." Opinion and Order, 11/15/17, at 5; *see also* Contestants' Exhibit Q (May 4, 2010 email) (wherein Lee stated that "the fact that I have control could certainly be seen as 'one-sided.'"); *id.* (wherein Lee stated that "[Linda's] comment is absolutely correct that the control is 'one-sided.'"). Specifically, as the Trustee, Lee has the sole discretion to make

additional payments from each beneficiary's trust for "support, education, medical care, other need, or a comfort," with no requirement that the three children are treated equally, and without any standards or criteria for making those determinations. The 2010 Will, 4/25/10, at 4. With respect to the lake house, the 2010 Will, on its face, gives each of the children and other adult descendants an equal opportunity to become active participants in the trust. However, as the sole Trustee, Lee creates the schedule for use of the property, and maintains the record of use, which "shall be determinative." *Id.* at 4, 5. Additionally, use of the lake house is "conditioned upon maintaining and leaving the property in excellent condition[,]" and Lee may preclude use of the lake house by any beneficiary who does not meet those undefined requirements. *Id.* at 4. Thus, considering the circumstances of this case, Lee received a substantial benefit under the 2010 Will.

Based upon the foregoing, the Orphans' Court concluded that Contestants had satisfied their initial burden of producing evidence to support a *prima facie* showing of undue influence. *Id.* at 6. The Orphans' Court also concluded that Lee had failed to meet his burden of producing clear and convincing evidence that the 2010 Will "was not the product of his undue influence." *Id.* We agree with the Orphans' Court's determinations, and discern no error in the Orphans' Court's allocations of the burdens of proof. We further observe that although Lee argues that Contestants failed to meet their burden of proof, he failed to establish that he satisfied his burden by

producing clear and convincing evidence to affirmatively demonstrate the absence of undue influence. **See In re Estate of Smaling**, 80 A.3d at 498.

As a final matter, we must address the portion of the Orphans' Court's Opinion and Order directing that the Estate be administered pursuant to the intestacy laws of Pennsylvania. "If it is possible to do so, a will must be construed to avoid an intestacy." **Burns**, 595 A.2d at 1167.

> In compliance with this policy favoring testamentary distribution of a decedent's assets, where a later will contains a clause of revocation of an earlier will, the clause of revocation fails if the testator is induced to make the later will by the exertion of undue influence. The very incapacity which destroyed the necessary intent to make the will also destroyed the intent to revoke the old one. Thus, the earlier will is reinstated when the unduly influenced will is declared invalid.

**Id.**; **see also In re Estate of Luongo**, 823 A.2d at 957 (stating that "once a will is proved to be intrinsically invalid, it no longer has the effect of revoking prior wills because the entire instrument is inoperative, including the revocation provision."); **id.** at 958 (indicating that a challenge to a will based on undue influence raises an intrinsic defect in the instrument). Based on these principles, we observe that the invalidation of the 2010 Will also invalidated the revocation provision contained therein. Thus, because Decedent had executed a prior will, an intestacy does not automatically result from the invalidation of the 2010 Will. However, it is unclear from the record before us whether the Orphans' Court considered the existence of the 2006 Will before entering its Order in this matter. We therefore reverse the portion of the Orphans' Court Order directing that the Estate be administered pursuant

to intestacy laws, and remand to the Orphans' Court to issue an order addressing the 2006 Will, and if appropriate, directing that the 2006 Will be deposited with the Register of Wills.

Order affirmed in part and reversed in part. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/5/2018