J-A11005-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ESTATE OF LILLIAN KEFALOS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: KATINA KEFALOS | |
| | No. 998 WDA 2020 |

Appeal from the Order Entered August 26, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  02-16-04715

BEFORE:  McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED: AUGUST 13, 2021**

Katina Kefalos ("Tina") appeals from the order confirming the validity of a 2006 will ("2006 Will") executed by her mother, Lillian Kefalos ("Mother") but invalidating Mother's 2014 codicil to her Will ("2014 Codicil"). We affirm.

This is a case concerning alleged undue influence by Tina upon Mother. The facts, as gleaned from the trial court's opinion and the certified record, are as follows. Mother had three children, Tina, George ("George"), and Kirana ("Candy") (George and Candy hereinafter collectively "Appellees"). Mother raised the children together with her husband in Pittsburgh, Pennsylvania. Mother's husband died in 1984. George currently resides in South Carolina. Candy resided in the Virgin Islands for several years and now lives in Oregon. Tina moved in with Mother in Pittsburgh in 2004.

Mother initially executed a will in 2004, dividing her property equally among the three siblings. The main assets Mother owned were three

properties in Pittsburgh: (1) A home on South Aiken avenue in which Mother and Tina lived ("South Aiken House"); 2) A rent-producing apartment building on Center Avenue ("Center Avenue Property"); and 3) A rent-producing apartment building on Fifth Avenue ("Fifth Avenue Property").

By 2006, Mother's mental health was declining and she was diagnosed with dementia. Tina admitted as much in a January 2006 email to George. That email stated that Mother's treating physician had advised that Mother should not be left alone at any time nor should she be making any decisions. In January 2006, Tina had taken over managing and collecting rent from the Center Avenue Property and the Fifth Avenue Property. She indicated to her siblings that she would like to be paid for her work, but that Mother was resistant to the idea and treated her "like a slave."

In May 2006, Tina assisted Mother in firing her long-time attorney and replacing him with attorney Carol Gross to draft a new will for Mother. Mother then, in May 2006, unbeknownst to Appellees, executed the 2006 Will bequeathing the South Aiken House solely to Tina but dividing the rest of her estate equally among the siblings. That same year, Mother also named Tina as her agent under a broad power of attorney.

Over the next several years, Mother's health and cognitive ability steadily declined. In 2012, Tina hired full time nursing care for Mother. By 2013, Tina expressed concern about Mother's declining health in emails to her siblings. In June 2014, Tina contacted Attorney Gross on Mother's behalf, regarding Mother's purported desire to execute a codicil to her 2006 Will. The

change would give both the South Aiken House and the Fifth Avenue Property solely to Tina, with the three siblings sharing equally only in the Center Avenue Property.

Ultimately, Attorney Gross drafted the codicil but refused to allow Mother to execute it because she felt that Mother did not understand the document. Tina then directed Attorney Gross to send the codicil to her and she contacted a different attorney, Ilene Fingeret, in hopes of having the codicil executed. Attorney Fingeret met with Mother at her residence and believed she had testamentary capacity. Therefore, she assisted Mother in executing the 2014 Codicil. Shortly after the 2014 Codicil was executed, Tina contacted physician Dr. Balestrino to evaluate Mother, but Tina abruptly stopped a cognitive evaluation before it was completed.

Mother passed away in 2016. At Mother's funeral, Appellees first learned of the 2006 Will and the 2014 Codicil. As executrix, Tina filed a petition for a grant of letters registering the 2006 Will and the 2014 Codicil. Appellees filed a challenge, claiming undue influence on the part of Tina. The trial court conducted a trial in June 2020. Appellees testified and presented the testimony of psychiatrist Dr. Bruce Wright. He opined that Mother suffered from a weakened intellect at the time she executed the 2006 Will and the 2014 Codicil. Therefore, according to Dr. Wright, Mother was susceptible to undue influence from her primary caregiver, Tina. Tina testified on her own behalf and also presented the testimony of Mother's long-term handyman James Lougee and Mother's longtime friend Evangeline Beldecos. Both opined

that Mother was of sound mind and wanted Tina to have both the South Aiken House and Fifth Avenue Property. A home health care nurse, Renee Techman, testified that she attended Mother starting in 2012 and Mother was alert until the time of her death.

The trial court issued a memorandum opinion and corresponding order in August 2020, finding that the 2006 Will was valid but the 2014 Codicil was not. The court determined that Mother did not yet have a weakened intellect in 2006, but by the time of the codicil, Mother's intellect had become weakened, making her susceptible to Tina's undue influence. Tina filed the instant timely appeal and both Tina and the trial court complied with Pa.R.A.P. 1925. Tina raises the following issues:

1) Whether the trial court erred in finding that [Mother] suffered from a weakened intellect when she executed the June 6, 2014 Codicil?

2) Whether the trial court erred in finding that [Tina] had a confidential relationship with [Mother]?

Tina's Br. at 6.[1]

In her first issue, Tina contends that the trial court erred by concluding that Mother had a weakened intellect at the time she executed the 2014 Codicil. She argues that the court failed to apply the correct "clear and convincing evidence" standard. She maintains that its failure to apply the

_____

[1] Appellees contend that this Court should deem Tina's issues waived due to a purported lack of specificity in her Pa.R.A.P. 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4). However, Tina's Rule 1925(b) statement was sufficient to alert the trial court to her current issues on appeal and our appellate review is not impeded. Therefore, we decline to find waiver.

correct standard is evident in its opinion, which states that the court was "rather certain" that Mother had a weakened intellect at the relevant time. *See* Tr.Ct.Op. 8/26/20, at 8.

Tina also avers that the court improperly placed too much weight on Dr. Wright's medical testimony rather than on the testimony of the executing attorney and witnesses who had daily familiarity with Mother's mental acuity. To this end, she points to the testimony of handyman Lougee, Mother's friend Beldecos, and home health care nurse Teichman. Tina also maintains that the court failed to place sufficient weight on the testimony of the executing attorney, Fingeret, who testified that Mother was of sound mind and wanted to give her property to Tina because her other children did not help her enough.

Conversely, Appellees assert that ample evidence supported the trial court's conclusion that Mother suffered from a weakened intellect at the time she executed the 2014 Codicil. They emphasize that medical records indicate that by 2002 Mother was already being treated for cognitive impairment, and by 2006, her doctor was recommending that she not be left alone. They note that Tina herself admitted to Mother's cognitive issues in several emails to her siblings from 2006 until 2014. Further, according to Appellees, Dr. Wright provided credible testimony regarding Mother's cognitive impairment. They also point out inconsistencies in the testimony of Lougee and Beldecos where they seem to acknowledge some of Mother's purported cognitive confusion.

Further, Appellees contend that the court correctly considered the testimony of both Attorney Gross and Attorney Fingeret. Appellees highlight that Attorney Gross met with Mother privately, after which she refused to facilitate Mother's execution of the codicil. In contrast, Attorney Fingeret admitted to only meeting with Mother briefly, and while she concluded that Mother had testamentary capacity, she could not opine as to whether Tina had exerted undue influence on Mother. Appellees specifically point to **Owens v. Mazzei**, 847 A.2d 700, 707 (Pa.Super. 2004), for the proposition that, in considering claims of undue influence, medical testimony about an individual's cognitive condition should be given substantial weight, even more so than testimony regarding the individual's demeanor at the time an instrument is executed.

We review the Orphans' Court's factual findings for an abuse of discretion and its legal conclusions for an error of law. **Id.** at 706. "Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of discretion." **Id.** (quoting **In re Estate of Harrison**, 745 A.2d 676, 678 (Pa.Super. 2000)) (brackets omitted). "If the court's findings are properly supported, we may reverse its decision only if the rules of law on which it relied are palpably wrong or clearly inapplicable." **Id.** (quoting **Harrison**, 745 A.2d at 678-79).

A contestant of a will who makes a claim of undue influence must first establish three things: (1) the testator and a claimant under the will were in

a confidential relationship; (2) the testator bequeathed the claimant a substantial portion of his or her estate; and (3) the testator was of weakened intellect. **In re Clark's Estate**, 334 A.2d 628, 632 (Pa. 1975); **Estate of Lakatosh**, 656 A.2d 1378, 1383 (Pa.Super. 1995). If the contestant carries this burden, the burden shifts to the claimant to prove, by clear and convincing evidence, that the will provision was not the product of undue influence. **Clark**, 334 A.2d at 632; **Lakatosh**, 656 A.2d at 1383.

Evidence of a "weakened intellect" offered to prove undue influence need not go so far as to prove testamentary incapacity:

> [W]eakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution. While Pennsylvania courts "have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." **In re Estate of Fritts**, 906 A.2d 601, 607 (Pa.Super. 2006) (citations omitted). Importantly, in an undue influence case, "[the Orphans' Court] has greater latitude to consider medical testimony describing a [testator's] condition at a time remote from the date that the contested will was executed." **Id.** (citation omitted). We will not revisit the [Orphans' Court's] conclusions when they rest on legally competent and sufficient evidence. **Id.**

**In re Estate of Nalaschi**, 90 A.3d 8, 14 (Pa.Super. 2014) (quotation marks and quotation omitted).

In this case, the trial court determined that Appellees established, via ample clear and convincing evidence, "that Tina exerted undue influence over [Mother] with regard to the 2014 Codicil." Tr. Ct. Op., 8/25/20 at 7. The court

found that Mother suffered from a weakened intellect due to the following seven factors:

> First, Tina had been providing physical and emotional care for [Mother] on a daily basis for over ten (10) years at that point. Second, Tina acknowledged that [Mother's] health was declining as early as 2006 and she sent many emails thereafter expressing concerns about further declines. Third, Tina was completely in charge of the management of the properties, including collecting rents, providing maintenance, and renovating them. Fourth, [Appellees] only visited very occasionally, which led [Mother] to rely on Tina even more. Fifth, Dr. Wright credibly testified that [Mother] had a weakened intellect in 2014. Sixth, in 2014, Tina sought an opinion from [Mother's] treating physician that [Mother] was competent to make legal decisions; but when the Doctor began to administer cognitive tests, Tina terminated the testing and she provided a poor excuse for doing so. Seventh, Attorney Gross, who had prepared the 2006 Will, would not permit [Mother] to execute the Codicil because she did not believe that [Mother] understood the terms, which led Tina to take [Mother] to another attorney, who had no knowledge of the situation between Tina and [Mother] over the previous ten years.

*Id.* at 8-9.

This was not an abuse of discretion. Contrary to Tina's assertion, the trial court properly utilized the "clear and convincing evidence" standard when determining that Mother suffered from a weakened intellect at the time she executed the 2014 Codicil. **See** Tr. Ct. Op. at 7; **Clark**, 334 A.2d at 632; **Lakatosh**, 656 A.2d at 1383. Moreover, the court aptly considered Dr. Wright's medical testimony, as well as the testimony of Attorney Fingeret who was present when Mother executed the 2014 Codicil. **See Nalaschi**, 90 A.3d at 14. Essentially, Mother asks this Court to reweigh the evidence in her favor, an invitation we must decline. **See id.** Determining the credibility of witnesses

is firmly within the purview of the trier of fact, and we do not conclude that the court abused its discretion in this regard. **See Owens**, 847 A.2d at 706. To the contrary, ample evidence supported its finding that Mother suffered from a weakened intellect at the time she executed the 2014 Codicil. Hence, Mother's first issue warrants no relief.

In her second issue, Tina asserts that the trial court erred by determining that she and Mother had a "confidential relationship." To this end, she points out that under Pennsylvania jurisprudence a parent/child relationship or even a principal/agent relationship does not alone establish a confidential relationship. **See Owens**, 847 A.2d at 709-10. Further, Tina argues that at the time the 2014 Codicil was executed, she did not serve as Mother's full-time care giver because Mother had full-time nursing care.

Appellees counter by emphasizing that an abundance of evidence supported the court's conclusion that Tina and Mother were in a confidential relationship. Tina handled all of Mother's business affairs, medical appointments, and supervised all of her personal care. Tina lived with Mother from 2004 on and held a broad power of attorney over all of Mother's personal property by 2006. Appellees point out that although not dispositive, the appointment of a person as one's agent under a broad power of attorney is a strong indicator of a confidential relationship with the agent. **See Foster v. Schmitt**, 239 A.2d 471, 474 (Pa. 1968) ("If there be any clearer indicia of a confidential relationship than the giving by one person to another of a power

of attorney over the former's entire life savings, this court has yet to see such indicia").

A confidential relationship exists where "the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." ***Owens***, 847 A.2d at 709 (citation omitted). It "is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." ***Wisniski v. Brown & Brown Ins. Co. of PA***, 906 A.2d 571, 577 (Pa.Super. 2006) (citation omitted). Certain types of relationships, such as those involving a power of attorney, are indicative, but not dispositive, of the existence of a confidential relationship, which is a question of fact. ***See In re Estate of Smaling***, 80 A.3d 485, 498-99 (Pa.Super. 2013) (*en banc*); ***In re Estate of Fritts***, 906 A.2d 601, 608-609 (Pa.Super. 2006).

In the instant case, the trial court found that a confidential relationship existed between Mother and Tina at the time Mother executed the 2014 Codicil due to multiple, accumulating factors:

> There is no question that Tina and [Mother] had a confidential relationship. Tina lived with [Mother] from 2004 until her death. Initially, [Tina] was in the basement of [Mother's] first floor apartment; then, at some point, she moved into the second-floor apartment and renovated it. Tina provided daily care for [Mother], including meal preparation, shopping, doctor's appointments, etc. Tina also took over management of the rental properties and handled [Mother's] finances. This is absolutely a confidential relationship.

Tr. Ct. Op. at 7.

Once again, we perceive no abuse of discretion. As noted, by the time Mother executed the 2014 Codicil, Tina served as Mother's supervising caretaker by living with Mother, organizing all of her medical appointments, and managing all of her financial interests. The record thus amply supports the trial court's finding that Mother and Tina had a confidential relationship because Mother depended almost entirely upon Tina. *See Wisniski*, 906 A.2d at 577; *McCown*, 192 A. at 676; *Smaling*, 80 A.3d at 498-99; *Fritts*, 906 A.2d at 608-609. Thus, Tina's second issue also must fail. Accordingly, we affirm the trial court's order invalidating the 2014 Codicil.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  8/13/2021

- 11 -