J-S35042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF: ANN P. VONNEUMAN, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: MICHAEL PREKOPA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 785 MDA 2021 |

Appeal from the Order Entered May 18, 2021
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  2216-0520

BEFORE:  OLSON, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED:  JANUARY 19, 2022**

Michael Prekopa (Prekopa) appeals from the order of the Court of Common Pleas of Dauphin County (orphans' court) finding that he unduly influenced his aunt, Ann P. Vonneuman (Decedent), into being named a joint account owner or beneficiary for almost all her bank and brokerage accounts before her death in May 2016.  As a result, the orphans' court ordered him to transfer the $1.91 million that he received from these accounts into Decedent's estate for distribution under her will.  On appeal, Prekopa challenges the orphans' court findings that (1) he was in a confidential relationship with Decedent, and (2) she suffered from a weakened intellect.  After review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

Decedent was born in 1916 and married Nicolas A. Vonneuman in 1946. The couple was married for over 60 years but had no children. In April 2010, at age 93, Decedent executed a last will and testament naming her husband as her sole heir. If he predeceased her, though, Decedent named her 16 nieces, nephews and grandnieces as equal contingent residual beneficiaries. Prekopa was Decedent's nephew and one of the beneficiaries but was also successor executor if Decedent's husband failed to qualify.

Decedent's husband died in March 2011 at age 99. A few months later, on June 9, 2011, Decedent executed a general durable power of attorney appointing Prekopa, her nephew, as her agent. Over the next five years, Prekopa was "either added as a joint owner, beneficiary under a pay on death designation, beneficiary under a transfer on death designation, or as beneficiary under an in trust for account with respect to almost all of Decedent's bank and brokerage accounts." Orphans' Court Opinion (OCO), 5/18/21, at 2. The orphans' court summarized what happened as follows:

> [O]n June 29, 2011, a new account was opened at Morgan Stanley for Decedent. [Prekopa] filled out the paperwork, and Decedent signed the paperwork at her home. [Prekopa] was named as transfer on death beneficiary of this account on July 30, 2011, and this account had a date of death value of $390,251.38. [Prekopa] was also added as a transfer upon death beneficiary for Decedent's Wells Fargo Advisors Account ending in 3682 on July 15, 2011. The paperwork to transfer assets to this account was prepared by [Prekopa]. This account had a date of death value of $444,295.85. Thereafter, on July 21, 2012, [Prekopa] was added as a joint owner to a Wells Fargo checking account ending in 0213 and a savings account ending in 2384. These two Wells Fargo

- 2 -

accounts had date of death values of $76,683.55 and $407,897.50, respectively.

On May 21, 2013, [Prekopa] was added to Decedent's PNC checking account ending in 2095 and Decedent's PNC savings account ending in 1390. These accounts had date of death values of $26,835.82 and $226,635.07, respectively. [Prekopa] was also added to Decedent's PNC CD account ending in 1951 on September 24, 2013, which had a date of death value of $62,379.50. No signature card was produced to evidence the addition of [Prekopa] to the PNC CD account x1951 or the PNC savings account x1390. On December 13, 2013, [Prekopa] was added as the beneficiary for two Citizens Bank CD accounts ending in 8069 and 4961. These two accounts had date of death values of $63,644.00 and $31,969.33, respectively.

[Prekopa] was added as beneficiary of Decedent's First Niagara CD account ending in 3045 on March 22, 2014. This account had a date of death value of $60,907.75. On October 15, 2014, three Susquehanna Bank CDs were closed, which respectively named Francine Walukiewicz, Elaine Nuss and Bonita Bracca as beneficiaries. The funds from these three CDs funded a new relationship checking account, which named [Prekopa] as joint owner. No signature card opening this new account was produced, and the account had a date of death value of $108,249.87. Finally, in October 2015, a Wells Fargo CD ending in 6824 was modified to add POD Stephanie Prekopa, who is [Prekopa's] daughter. This CD had a date of death value of $11,114.75.

*Id*. at 2-4.

Thus, when Decedent died of Alzheimer's disease in May 2016, Prekopa

received $1,910,865.23.[1] After being named executor of the estate, Prekopa

_____

[1] Section 6304 of Multiple Parties Account Act states that "[a]ny sum remaining on deposit at the death of a party to a joint account belongs to the surviving party ... as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created." 20 Pa.C.S. § 6304(a). A party challenging the survivorship rights

filed his first and final accounting in January 2018. In his accounting, he excluded the $1.91 million from the probate property, listing a balance of distribution (minus disbursements) of only $217,299.43.[2] In March 2018, Lisa Kreisl, Max Enama, Jr., Tamara Caciola, Elaine Enama and Tiffany Maylath (Objectors) filed objections alleging, among other things, that Prekopa exerted undue influence over Decedent in being designated as a joint account holder or beneficiary of Decedent's bank and brokerage accounts. In their view, the $1.91 million that he received should be made part of her estate and distributed in accordance with her will.

At the orphans' court hearing, Objectors presented the deposition testimony of Dr. Neil Skolnik, M.D., an academic family physician with board certifications in family medicine and geriatrics. Dr. Skolnik saw Decedent as a patient four times in the summer of 2013. According to him, Decedent was in "good shape" for a 96-year-old at her first appointment. However, when he saw her again in June, it became apparent that she was suffering from

_____

of a joint account, such as the one at issue, must produce evidence "so clear, direct, weighty, and convincing that the fact finder could, without hesitation, come to a clear conviction that [the] [d]ecedent, in fact, had not intended that there be a right of survivorship, despite the manner in which the account was held." *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010).

[2] Because one of the residual beneficiaries died after Decedent executed her will, this meant that each beneficiary would receive a 1/15th share of the estate, which came out to $14,486.63 per beneficiary. A second beneficiary died while the matter was pending.

- 4 -

dementia, leading him to recommend a formal driving evaluation and follow-up appointment. When she did not show for that appointment, he filled out a reporting form for the Pennsylvania Department of Transportation (Department) stating that Decedent suffered from "cognitive impairment." He met Decedent again in July but she refused to do any testing for dementia. He explained to her that he planned to submit the form to the Department to have her license revoked. In August, Decedent returned without an appointment because she had received a letter revoking her license and she wanted Dr. Skolnik to write her a letter to get her license back. Realizing that Decedent did not remember their prior discussion, Dr. Skolnik had Decedent do part of a mental status exam. Based on her poor performance, Dr. Skolnik concluded that Decedent had "significant dementia." Dr. Skolnik opined that from the time he first saw Decedent as a patient in 2013, her "degree of dementia would not have allowed her to make thoughtful, competent financial decisions." Therefore, according to him, Decedent would have lacked the mental capacity to understand the consequences of naming somebody as a beneficiary of a bank account.

Dr. Skolnik also stated that Decedent's dementia predated when he first saw her as a patient, starting at least from some time in 2011. To make this determination, he reviewed statements from two of the Objectors, Lisa Kreisl (Kreisl) and Tamara Caciola (Caciola), both of whom were Decedent's grandnieces. Both described Decedent being forgetful after her husband died

and often failing to remember phone conversations from a week before. Both also recounted that Decedent told them about how Decedent's husband fell inside their house not long before he died in March 2011. She told them he laid on the floor for three days before she finally called 911. When asked why she waited so long, Decedent said her husband did not want her to and that she wanted no one in her house. According to Dr. Skolnik, an individual with normal decision-making capacity would not have let their husband lie on the floor for so long before getting help.

Kreisl, meanwhile, described another incident in 2012 when Decedent was visiting her mother and wore a sweater for several days. When someone washed the sweater, Decedent became irate. According to Dr. Skolnik, this showed that Decedent had trouble negotiating social interactions and regulating her emotions. These impairments were common in advanced dementia, again suggesting that her dementia predated seeing him as a patient. Thus, he believed Decedent suffered from dementia in 2011 and would have lacked the capacity to make competent financial decisions.[3]

_____

[3] Objectors also presented Stephen Scherf, a certified public accountant and forensic fraud examiner. His testimony summarized the various transactions between 2011 and 2016 that led to the transfer of the $1.91 million to Prekopa because of Decedent's death. His expert opinion, however, was limited to the computation of the amount that Objectors claimed Prekopa received through undue influence, not whether that such undue influence, in fact, occurred.

Prekopa did not offer an expert to refute Dr. Skolnik. Instead, he detailed how he and his wife visited Decedent at least once every two weeks after her husband died in 2011. During these visits, he helped around the house and helped Decedent pay her bills. According to him, however, Decedent remained independent after her husband's death. Prekopa insisted that all the changes to her bank accounts were done at her direction and with full knowledge. While admitting that Decedent did not explicitly state so or change her will, Prekopa asserted that Decedent intended for him to have the money because of how close he was to her in her final years.

On May 18, 2021, the orphans' court entered its decision finding that Objectors sustained their burden in establishing that Prekopa exerted undue influence in being named a joint account holder or death beneficiary of all Decedent's bank accounts before her death. As a result, the orphans' court ordered that Prekopa transfer the funds he received to Decedent's estate for distribution under her will.[4]

Prekopa timely appealed and raises four issues for review:

A. Whether the [orphans'] court committed an error of law and abused its discretion in concluding that Decedent was unduly influenced?

B. Whether the [orphans'] court committed an error of law and abused its discretion in concluding that [Prekopa] was in a

---

[4] The orphans' court also ordered that Prekopa be removed as executor; that Objectors' counsel fees and costs be paid by the estate; and that Prekopa be surcharged for Objectors' expert witness fees. *See* Order, 5/18/21, at 2.

confidential relationship with Decedent when Decedent was fiercely independent?

C. Whether the [orphans'] court committed an error of law and abused its discretion in concluding that Decedent had a weakened intellect based on the pure speculation of a treating physician who saw Decedent four times in a three[-]month span but was incredibly able to opine that Decedent had dementia two years before she became his patient?

D. Whether the [orphans'] court committed an error of law and abused its discretion in broadly ordering the transfer of the entirety of the account holding the funds [Prekopa] received from Decedent without giving him credit for any growth of his individual money in the account and the taxes he paid on the account?

Prekopa's Brief at 5.

**II.**

Prekopa's first three issues all go to the same issue: whether Objectors sustained their burden of clear and convincing evidence that he exerted undue influence over Decedent.

This Court has stated:

"[U]ndue influence is a 'subtle,' 'intangible' and 'illusive' thing," "generally accomplished by a gradual, progressive inculcation of a receptive mind." Consequently, its manifestation "may not appear until long after the weakened intellect has been played upon." Because the occurrence of undue influence is so often obscured by both circumstance and design, our Courts have recognized that its existence is best measured by its ultimate effect. Thus, the Courts' holdings establish a presumption of undue influence when the evidence demonstrates: (1) that a person or persons in a confidential relationship with a testator or grantor has (2) received a substantial portion of the grantor's property, and (3) that the grantor suffers from a weakened intellect. Once the presumption has attached, the burden of proof shifts to the defendant to disprove undue influence by clear and convincing evidence that one of the foregoing criteria is not established.

- 8 -

***Owens v. Mazzei***, 847 A.2d 700, 706 (Pa. Super. 2004) (citations omitted).

Prekopa concedes he received a substantial benefit but contests the confidential relationship and weakened intellect elements. We discuss these elements in turn.[5]

**A.**

Prekopa first challenges the orphans' court finding of a confidential relationship between him and Decedent.

> A confidential relationship exists whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other.... Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest. Further, the existence of a power of attorney given by one person to another is a clear indication that a confidential relationship exists between the

---

[5] Our standard of review for a challenge to an orphans' court decree is well-settled.

> When reviewing a decree entered by the orphans' court, this Court must determine whether the record is free from legal error and the [orphans'] court's factual findings are supported by the evidence. Because the orphans' court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions.

***In re Estate of Hooper***, 80 A.3d 815, 818 (Pa. Super. 2013) (citation and extraneous capitalization omitted).

> parties. In fact, no clearer indication of a confidential relationship can exist than giving another person the power of attorney over one's entire life's savings. This is particularly true when the alleged donee is shown to have spent a great deal of time with the decedent or assisted in decedent's care.

*Estate of Lakatosh*, 656 A.2d 1378, 1383 (Pa. Super. 1995) (citations, brackets, quotation marks and paragraph break omitted).

The orphans' court found that "there can be no dispute that [Prekopa] was in a confidential relationship with Decedent," since she named him her agent under a general power of attorney. *See* OCO at 5. Prekopa challenges this finding by emphasizing that a principal/agent relationship alone does not establish a confidential relationship. He then reviews his evidence depicting Decedent as being independent and mentally sound well after naming Prekopa as her agent. He asserts that there is no evidence that he and Decedent were on unequal terms or that he influenced or restrained her free will. Instead, he notes that she lived by herself in her home until being hospitalized in December 2015 and moved to a nursing home in January 2016. Prekopa reiterates his testimony that all of Decedent's decisions to add him to her accounts were done at her direction, even when he drove her to the banks after her license was revoked. Thus, according to Prekopa, the orphans' court erred in finding clear and convincing evidence that he and Decedent were in a confidential relationship.

We find no abuse of discretion in the orphans' court's factual finding of a confidential relationship between Prekopa and Decedent. According to

Prekopa, he and his wife were close to Decedent and would go to visit her and her husband once every three weeks, with his visits increasing when Decedent's husband's cancer worsened in 2010. *See* N.T., 11/12/20, at 247. After Decedent's husband passed away in March 2011, Prekopa and his wife would visit once every two weeks but would sometimes visit on consecutive weeks if Decedent became lonelier. *Id*. at 250. During the visits, Prekopa and his wife would talk to Decedent and help around the house. *Id*. at 252. After becoming her agent, Prekopa assisted Decedent "in whatever decisions that she was making." *Id*. at 253. These including taking her to banks or creating paperwork and helping her pay bills. *Id*. Eventually, Prekopa would write out the checks because of Decedent's arthritis or pay the bills online. *Id*. at 254. Thus, based on Prekopa's testimony, the orphans' court had ample evidence to find that Decedent depended heavily on Prekopa after her husband passed away, leading to her less than three months later making him her agent under a durable general power of attorney. *See Foster v. Schmitt*, 239 A.2d 471, 474 (Pa. 1968) ("If there be any clearer indicia of a confidential relationship than the giving by one person to another of a power of attorney over the former's entire life savings, this court has yet to see such.").

Moreover, the orphans' court credited Dr. Skolnik's expert testimony that Decedent would have suffered from dementia in 2011. *See* OCO at 6. ("Furthermore, Dr. Skolnik credibly opined that Decedent's dementia dated back to at least 2011."). This opinion heavily relied on the 2011 incident

involving Decedent's husband falling in their home and her not calling for help for two or three days. Citing Dr. Skolnik's deposition, the orphans' court found that he "credibly opined that this situation showed that Decedent did not have the capacity to determine what to do because she would not have let her dearly loved husband lie on the floor for that length of time if she could have thought what she could do to help." *Id*. While the orphans' court made this finding for weakened intellect, it is just as applicable to the confidential relationship element and the orphans' court crediting Dr. Skolnik's expert testimony about Decedent's dementia.

"The question of whether or not a confidential relationship exists between the parties is intensely fact-specific." *Wisniski v. Brown & Brown Ins. Co. of PA*, 906 A.2d 571, 578 (Pa. Super. 2006) (citations omitted). Given that the orphans' court credited Dr. Skolnik's opinion, we are bound by the orphans' court's factual determination on this element when that determination is supported by competent evidence. Prekopa cites no analogous caselaw of someone suffering from dementia being thought to deal in equal terms with their agent under a power of attorney. Instead, he merely advances his own testimony that Decedent was independent and mentally sound when she made him her agent under the general power of attorney. In effect, he is asking us to credit his testimony and find that the orphans' court abused its discretion in its factual finding that there was a confidential relationship. Because we cannot do this, his first challenge fails.

**B.**

We next address the orphans' court's determination that Decedent suffered from a weakened intellect.

> [W]eakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution. While Pennsylvania courts "have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." *In re Estate of Fritts*, 906 A.2d 601, 607 (Pa. Super. 2006) (citations omitted). Importantly, in an undue influence case, "[the Orphans' Court] has greater latitude to consider medical testimony describing a [testator's] condition at a time remote from the date that the contested will was executed." *Id.* (citation omitted).

*In re Estate of Nalaschi*, 90 A.3d 8, 14 (Pa. Super. 2014) (quotation marks and quotations omitted).

Prekopa asserts that Objectors failed to present clear and convincing evidence that Decedent suffered from a weakened intellect. Focusing first on Dr. Skolnik, Prekopa argues that his expert testimony "was not credible as it was based on pure speculation." He questions Dr. Skolnik's opinion that Decedent had dementia from 2011 onward when she did not become his patient until 2013. Prekopa notes that Dr. Skolnik saw Decedent only four times over three months in 2013, and even though he diagnosed her as having dementia, Dr. Skolnik never contacted the local agency on aging, as his only concern was with her ability to drive.

Prekopa next highlights that there were conflicting assessments about how far Decedent's dementia had progressed. He notes that Decedent saw a different doctor in September 2013 who found no impairments. Additionally, when Decedent was admitted to an assisted living facility in March 2016, her initial assessment listed her as only having early dementia. In Prekopa's view, these conflicting assessments show that Dr. Skolnik's diagnosis was wrong.

Prekopa also faults Dr. Skolnik for relying on the written statements of Kreisl and Caciola. Prekopa characterizes them both as interested parties who were neither close to Decedent nor visited her as much as he did to know how Decedent was doing. While both claimed Decedent was depressed after her husband's death, neither felt concerned enough to visit her nor contact the local agency on aging. Thus, Prekopa asserts no weight should have been afforded to their statements about Decedent, as it was understandable that she would be depressed and lonely after the death of her husband of more than 60 years. He also asserts that "[t]here is no evidence of [Decedent's] persistent confusion, forgetfulness, or disorientation," as he downplays when Decedent showed up to Dr. Skolnik's office because her license had been revoked. Prekopa calls this a "one-time occurrence" that should be disregarded.

Finally, Prekopa alleges that Objectors "confuse correlation and causation," arguing that Decedent's decision to make him her primary beneficiary does not mean that he used undue influence to accomplish this

result. As he did before, Prekopa asserts that Decedent's decision was based on him and his wife being close to her after her husband's death, and Decedent wished to reward Prekopa for his efforts.

As this summary shows, Prekopa's argument alternates between asserting that the orphans' court's weakened intellect finding was supported by neither sufficient evidence nor the weight of the evidence. Like his confidential relationship argument, Prekopa asserts a purely factual argument citing no caselaw.[6]

First, the orphans' court had sufficient evidence to conclude that Decedent suffered from a weakened intellect in 2013 when Dr. Skolnik began to see her as her doctor. As noted, Objectors presented expert testimony from Dr. Skolnik, a family physician with over 30 years' experience and a board certification in geriatrics. **See** Skolnik Deposition, 8/20/20, at 12-13.[7]

---

[6] Our review is deferential to the orphans' court as the factfinder.

> The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

**Estate of Maddi**, 167 A.3d 818, 822 (Pa. Super. 2017) (citation omitted).

[7] Dr. Skolnik's videotaped deposition was shown at the hearing. **See** N.T., 11/10/20, at 130. While watching the deposition, the orphans' court overruled

- 15 -

He testified that Alzheimer's disease, Decedent's eventual cause of death, is a progressive neurodegenerative illness that is the most common cause of dementia. He described dementia as follows:

> …Dementia being a syndrome that can have a number of different causes, but that is characterized by decreased mental capacity, decreased executive function, ability to decide what to do when, decreased often in spatial discrimination, decreased memory, making it progressively more difficult for someone to both function on their own and certainly more difficult for someone to make decisions of any degree of complexity that require judgment.

*Id*. at 16.

Dr. Skolnik first saw Decedent as a patient in April 2013. During her second visit in June, he testified that it became clear that Decedent had "some degree" of dementia, at least enough to question her driving and have her return for a more in-depth determination. *Id*. at 27. However, when Decedent failed to show for her follow-up appointment, Dr. Skolnik submitted a reporting form recommending a formal driving evaluation. *Id*. at 27-28. When she showed for her third appointment in July, Dr. Skolnik explained to her that given his concerns about her driving, he would submit the form to have her license taken away. *Id*. at 29. Decedent returned without an appointment in August when she received notice that her license was

_____

Prekopa's objection that Dr. Skolnik had an insufficient basis for his opinion as to whether Decedent had dementia when he saw her in 2013. *Id*. at 134. The orphans' court made the same ruling on his opinion that Decedent's dementia dated to 2011. *Id*. at 141. Prekopa challenges neither of these rulings on appeal.

suspended. *Id*. at 31. According to Dr. Skolnik, Decedent had no recollection of their discussion a few weeks earlier, thus showing her dementia was much more advanced than he first thought. *Id*. at 32.

Dr. Skolnik then did part of a mental status exam with Decedent. This included having her draw the face of a clock. He explained:

> It turns out that people with dementia progressively have more and more difficulty organizing objects in space. And the clock test, drawing a clock, is a typical question.
>
> It was very dramatic when I asked her to draw into the clock, she put – she bunched up a bunch of numbers in just a little upper right-hand corner, like between noon, between 12:00 and 2:00, all of the numbers, a bunch of numbers were bunched in there and then there are no other numbers anywhere else on the clock. That, again, is something that reflects advanced dementia.
>
> We tried doing it again, because I'll be honest with you, I was surprised to see to see how bad that looked. That she didn't notice that it was wrong. And when I asked her to do it again, she put the numbers in correctly, but I had had asked her to also indicate a time, you know, a time, and she, she was so concentrating on putting the numbers in right, that she then didn't put any hands on the clock. She forgot to write what time it was and handed it back to me.

*Id*. at 33-34. He also recounted Decedent could not remember three items for even a short amount of time:

> Another indicator of her dementia was her inability to remember three objects for any length of time. So she could say it back to you immediately, you know, shoe, flower, pen. She could say, "shoe, flower, pen," but she couldn't say that 30 seconds or even a minute later. So it was very clear, at that point, that she had advanced dementia.

*Id*. at 34.

Dr. Skolnik opined that Decedent's degree of dementia in 2013 "would not have allowed her to make thoughtful, competent decisions." *Id*. at 37. He illustrated what he meant by testifying as follows:

> …So financial decisions like a loaf of bread will costs you $1.30 she could do. But anything more complex than that, anything that would require judgment, she had neither the executive capacity to weigh the risk and benefit of relative decisions that she might make financially or the ability to remember, even a short period of time ago, if she made a related decision. …

*Id*. at 37-38.

When asked if this would include adding a beneficiary to a bank account, he stated that it would fall under the category of complex decision-making that Decedent did not have the capacity to make competently. *Id*. at 39. This was revealed, he believed, by Decedent's failure to recall that he had her license revoked. In his view, if she could not remember something as important to her as that, then "there is no way she would have remembered transferring an account or doing anything different with one account, if she were asked again to do something with a different account at any point later in time." *Id*. at 42.

Based on this testimony, the orphans' court did not abuse its discretion by concluding that Decedent was suffering from a weakened intellect in 2013. "If the [Orphans' Court's] decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions." *Fritts*, 906 A.2d at 607. While Prekopa highlights conflicting evidence, the orphans' court was free to weigh these arguments and resolve them in Objectors' favor. Citing no caselaw that

would compel us to set aside that factual determination, we will not disturb the orphans' court's finding that Decedent suffered from dementia when she saw Dr. Skolnik as a patient in 2013.

Second, we will not disturb the orphans' court's finding that Decedent's dementia dated back to 2011. As the orphans' court explained:

> …Dr. Skolnik credibly opined that Decedent's dementia dated back to at least 2011. ([Skolnik Deposition] at p. 48). In support of this opinion, Dr. Skolnik relied on a story that had been relayed to him by Objectors and was ultimately confirmed by [Prekopa] and his wife at the Hearing of this matter. Thus, it is undisputed that, shortly before his death, Nicolas Vonneuman fell by the stairs in the home that he shared with Decedent, and Decedent did not call an ambulance to help for two or three days. (*Id*. at 48). Decedent allowed her beloved husband to lay on the floor of their home for at least two, if not three days before finally calling for ambulance after speaking with [Prekopa's] wife, Stella Prekopa. (N.T. 98-99, 293). Dr. Skolnik credibly opined that this situation showed that Decedent did not have the capacity to determine what to do because she would not have let her dearly loved husband lie on the floor for that length of time if she could have thought through what she could do to help him. ([Skolnik Deposition], p.48-49). Therefore, Dr. Skolnik concluded that Decedent did not have sufficient mental capacity to make competent decisions about finances, including changing the beneficiary of an account or adding a name onto an account as early as March of 2011. (*Id*. at p.52).

OCO at 6.

Again, Dr. Skolnik's opinion was legally competent evidence that the orphans' court was free to rely on in determining that Decedent's dementia predated adding Prekopa as a joint account holder or beneficiary to all her bank accounts. Prekopa did not provide any expert testimony of his own to rebut Dr. Skolnik's opinion. Nor does he cite any analogous caselaw for the

proposition that Dr. Skolnik lacked a sufficient basis for his opinion or that it was insufficient for the orphans' court's weakened intellect finding. Instead, he merely asks this Court to reweigh the evidence in his favor.

Appellate review of weight of the evidence claims is limited. It is well-settled that:

> [a]ppellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations omitted).[8]

_____

[8] In *Clay*, our Supreme Court added that:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Id.*

Prekopa is essentially asking us to disregard the trial court's determination that Dr. Skolnik's testimony was credible. What that ignores is that credibility determinations are within the trial court's discretion, and absent some manifest abuse of discretion in making that determination, we cannot disturb that determination on appeal. Because nothing in the record even hints at an abuse of discretion in the trial court's part in finding Dr. Skolnik credible and crediting his testimony, Prekopa has not made out a weight of the evidence claim.

Accordingly, because there was sufficient evidence supporting the orphans' court's finding that Decedent's dementia dated to 2011, we find no abuse of discretion in its finding that Decedent was of weakened intellect. **See Owens**, 847 A.2d at 707-08 (rejecting challenge to finding of weakened intellect where orphans' court's finding was supported by sufficient evidence).

**III.**

In his final issue, Prekopa asserts that the orphans' court erred in ordering him to transfer the entirety of the account holding the funds he received from Decedent. At the hearing, Prekopa informed the orphans' court that he moved all the funds he received because of Decedent's death into a Fulton Financial Advisors account. Upon learning this, the orphans' court froze the account until further order. After later holding that Prekopa unduly influenced Decedent, the orphans' court ordered Prekopa to "transfer the entirety of his Fulton Financial Advisors account" to Decedent's estate.

In a one-paragraph argument, Prekopa argues that this remedy was too broad because it excluded any growth of the funds since Decedent's death, and though he did not provide any evidence that he paid any taxes and fees, the orphans' court did not give him credit for taxes and other fees that he personally paid on the account.

As this Court recently explained:

> An appellant must develop arguments in his brief with citation to the record and relevant authority. Pa.R.A.P. 2119(a). The Rules of Appellate Procedure clearly state that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. *Commonwealth v. Martz*, 232 A.3d 801, 811 (Pa. Super. 2020). "We shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument[.]" *Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018). To do so would place this Court "in the conflicting roles of advocate and neutral arbiter." *Commonwealth v. Williams*, 566 Pa. 553, 782 A.2d 517, 532 (2001) (Castille, J., concurring). Therefore, an appellant waives any issue he fails to develop sufficiently. *Sephakis v. Pa. State Police Bureau of Records*, 214 A.3d 680, 686-87 (Pa. Super. 2019).

*Trust Under Deed of Ott*, ___ A.3d ___, 2021 WL 4735330, at *8 (Pa. Super. October 12, 2021).

Prekopa fails to develop his final issue in any meaningful way. Instead, he baldly claims the orphans' court's remedy was overly broad without citing any relevant legal authority on the court's discretion in fashioning a remedy based on its finding of undue influence, and then fails to provide any fact-specific legal analysis. He also fails to address why he would not be unjustly enriched by claiming money earned on funds which he obtained by undue influence. In the absence of such, it is not the duty of this Court to develop

that argument for him and then place in the role of having to analyze it.  We find Prekopa's final issue is waived.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/19/2022